# DECISIONS

## OF THE

## SUPREME JUDICIAL COURT

### OF

## MASSACHUSETTS

---

BUILDING INSPECTOR AND ZONING OFFICER OF
AQUINNAH[1] & others[2] *vs.* WAMPANOAG AQUINNAH
SHELLFISH HATCHERY CORPORATION & another.[3]

Dukes. September 8, 2004. - December 9, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Wampanoag Tribal Council. Zoning,* Enforcement. *Governmental Immunity. Waiver. Corporation,* Non-profit corporation.

In a case brought by a Native American tribe seeking to evade a zoning enforcement action and, ultimately, compliance with local permitting

---

[1]Formerly the town of Gay Head.

[2]UMB Bank, trustee of the Thomas P. Benton Trust (UMB); Aquinnah/Gay Head Community Association, Inc. (formerly Taxpayers' Association of Gay Head, Inc.) (association); and the Attorney General. UMB and the association were permitted to intervene in the Superior Court, while the Attorney General, on behalf of the Commonwealth, moved, and was allowed, to intervene in the Appeals Court.

[3]Wampanoag Tribal Council of Gay Head, Inc.

requirements on the grounds of tribal sovereign immunity, the record clearly established that the tribe had waived its immunity in no uncertain terms in a duly executed settlement agreement (entered into by the tribe during an earlier dispute over the property in question), and that the tribe bargained for, and knowingly agreed to, that waiver. [11-17] IRELAND, J., dissenting.


CIVIL ACTION commenced in the Superior Court Department on May 1, 2001.

The case was heard by *Richard F. Connon*, J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*James L. Quarles, III*, for the plaintiffs.

*Michael S. Nuesse* for UMB Bank.

*Thomas A. Barnico*, Assistant Attorney General, for the Commonwealth.

*Douglas J. Luckerman* (*David Kaplan & Nicole Friederichs* with him) for the defendants.

*Eric W. Wodlinger & Johanna W. Schneider*, for Martha's Vineyard Commission & others, amici curiae, submitted a brief.

GREANEY, J. We granted an application for direct appellate review to determine whether the defendants, Wampanoag Aquinnah Shellfish Hatchery Corporation (Hatchery) and Wampanoag Tribal Council of Gay Head, Inc. (Tribe), may properly invoke a claim of sovereign immunity to evade a zoning enforcement action and, ultimately, compliance with local permitting requirements. The case concerns the construction of a shed and a pier platform on real property known as the Cook Lands, a coastal area bordered by Menemsha Pond, located in the town of Aquinnah (formerly Gay Head),[4] Martha's Vineyard. After hearing cross motions for summary judgment, a Superior Court judge dismissed the complaint and entered judgment in favor of the defendants, declaring that the Tribe retains sovereign immunity from civil suit to enforce the local permitting requirements. We conclude that with respect to its land use on the Cook Lands, the only land in dispute in this case, the Tribe

---

[4]References to the town of Gay Head or Aquinnah are used interchangeably.

waived its sovereign immunity, thus subjecting the Tribe and the Hatchery to the zoning enforcement action. The order and judgment shall be vacated. The case is remanded for (1) entry of a judgment declaring that the Tribe, with respect to its land use activities on the Cook Lands, waived sovereign immunity and that the defendants are not immune from the zoning enforcement action; and (2) further proceedings consistent with this opinion.

The following facts are undisputed. The Tribe was incorporated as a Massachusetts nonprofit corporation in 1972. In 1974, the Tribe commenced an action in the United States District Court for the District of Massachusetts against the town of Gay Head, claiming that certain transfers of land in the town to which the Tribe claimed title had violated the Indian Nonintercourse Act, 25 U.S.C. § 177.[5] In 1981, the Tribe petitioned for (but did not obtain until about six years later) Federal recognition of its existence as a Native American Tribe. In 1983, the Tribe, the town, the State, and the intervener Aquinnah/Gay Head Community Association, Inc. (formerly Taxpayers' Association of Gay Head, Inc.) (association),[6] entered into a "Joint Memorandum of Understanding Concerning Settlement of the Gay Head, Massachusetts Indian Land Claims" (settlement agreement). The settlement agreement and, in particular, the Tribe's agreement to extinguishment of all "aboriginal" claims to the property subject thereto[7] was conditioned on the enactment of implementing legislation and on the appropriation of funding to finance the purchase of several hundreds acres of land for the Tribe. In the settlement agreement, the Tribe agreed that it would create another State-chartered corporation, called the Tribal Land Corporation, for the purpose of permanently holding the property, including the Cook Lands, subject to the

[5]Section 177 of the Indian Nonintercourse Act provides, in relevant part:

"No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177 (2000).

[6]The association is comprised of individual land owners unaffiliated with the Tribe.

[7]Pursuant to the settlement agreement, the town and private landowners agreed to transfer more than 200 acres of land in the town to the Tribe.

agreement. In addition, the settlement agreement contains the following:

> "3. . . . . The Tribal Land Corporation shall hold the Settlement Lands, and any other land it may acquire, *in the same manner, and subject to the same laws, as any other Massachusetts corporation,* except to the extent specifically modified by this agreement and the accompanying proposed legislation. *Under no circumstances, including any future recognition of the existence of an Indian tribe in the Town of Gay Head, shall the civil or criminal jurisdiction of the Commonwealth of Massachusetts, or any of its political subdivisions, over the settlement lands, or any land owned by the Tribal Land Corporation in the Town of Gay Head, or the Commonwealth of Massachusetts, or any other Indian land in Gay Head, or the Commonwealth of Massachusetts, be impaired or otherwise altered,* except to the extent modified in this agreement and in the accompanying proposed legislation. . . .

> "5. The Town of Gay Head shall convey the so-called Cook Lands [The Cook Lands constitute 'other land' the Tribal Land Corporation 'may acquire,' as provided in Section 3] to the Tribal Land Corporation. Such property . . . shall remain subject to taxation and foreclosure in the same manner as any other privately owned property in Gay Head. *Any structure placed on this property shall be subject to all Federal, State and local laws, including Town zoning laws, State and Federal conservation laws, and the regulations of the Martha's Vineyard Commission* . . . . Changes in Town zoning laws made subsequent to the date of this [agreement] may be made applicable to such Cook Lands only in the manner provided for changes to the Land Use Plan as described in Paragraph 16 of this [agreement]. If the said property is used for any purpose not permitted by the Land Use Plan, or is sold, leased or otherwise alienated by the Tribal Land Corporation to any entity other than one which is Indian controlled, all right, title and interest in the property shall revert to the Town of Gay Head, provided however, that nothing herein shall prevent the granting of a valid mortgage on the said property. . . .

"16. . . . [T]he Land Use Plan [is] attached hereto and made a part hereof. The Land Use Plan shall be enacted as part of the zoning law of the Town of Gay Head. Future amendments of the Land Use Plan as applicable to the Settlement Lands and embodied in the Town Zoning Law will require approval by the Tribal Land Corporation, by the Town of Gay Head (by whatever majority is usually required for such amendments) at two town meetings not less than one month apart, at least one of which shall be held during the month of July or August, and by such officials, if any, of the Commonwealth whose approval is required for amendments to zoning laws." (Emphases added.)

The land use plan contains a section that pertains specifically to the Cook Lands and provides that the Cook Lands "will be subject to normal health and building regulations of Gay Head and the Commonwealth, as they are in force at the time in question, and to [S]tate and [F]ederal conservation laws and the regulations of the Martha's Vineyard Commission. Town zoning laws applicable to these lands may be changed only in the manner provided in the Settlement Agreement."

When the parties executed the settlement agreement, the 1983 zoning bylaw was in effect. Section VII(A) of the bylaw authorizes the building inspector to enforce the bylaws and contains a building permit requirement:

"This By-Law shall be enforced by the Building Inspector . . . . No building shall be built or altered and no use of land or building shall be begun or changed without a permit having been issued by the Building Inspector. . . . Permits not used within a year's time shall become void. Each application for a permit shall be accompanied by such plans, surveys, and other data as may be necessary in the opinion of the Building Inspector to insure full compliance with this By-Law."

Section II(H)(1) of the bylaw contains a special permit requirement and provides:

"There shall be no construction of buildings or structures within 200 feet of wetlands, waterbodies,

beaches, dunes, or the crests of bluffs over 15 feet high until a special permit is obtained from the Planning Board Plan Review Committee, providing that within 100 feet of said wetlands, waterbodies, beaches, dunes or bluffs, a special permit may only be granted for a fishing related marine commercial structure."

Section II(A)(3) of the bylaw establishes a coastal district by reference to a 1983 zoning map. The coastal district's boundaries are described in § 07.20 of the current zoning bylaw as follows:

"The land, streams and wetlands which lie below the ten (10) foot elevation above mean sea level, or within five-hundred (500) feet at the inland edge of any beach or marsh grasses behind mean high water of . . . Menemsha Pond . . . ."

The description is identical to the boundaries appearing in the 1983 zoning map.

In 1985, the Massachusetts Legislature enacted St. 1985, c. 277, entitled "An Act to implement the settlement of the Gay Head Indian land claims" (State implementing Act). The State implementing Act provides:

"SECTION 4.

" . . .

"(*c*) The zoning and subdivision ordinances and regulations of the town of Gay Head shall not be applicable to the settlement lands except to the extent and in the manner provided in the settlement agreement. The settlement lands shall be subject to the land use plan made a part of the settlement agreement which shall be enacted as part of the zoning ordinance of the town of Gay Head, and such plan as embodied in the zoning ordinance may be amended only with the agreement of the Tribal council or any successor in interest, and by the town of Gay Head at two town meetings not less than one month apart, at least one of which shall be held during the month of July or August.

"(*d*) *The zoning laws* of the town of Gay Head which

443 Mass. 1 (2004)                                           7

Building Inspector of Aquinnah *v.* Wampanoag Aquinnah Shellfish Hatchery Corp.

are currently in force *shall continue to apply to the Cook lands* and any changes in those zoning laws shall apply to the Cook lands only if adopted in the manner provided by the settlement agreement.

"SECTION 5. Except as provided in this act, *all laws, statutes and bylaws of the [C]ommonwealth, the town of Gay Head, and any other properly constituted legal body, shall apply to all settlement lands and any other lands owned now or at any time in the future by the [Tribe] or any successor organization.*" (Emphases added.)

St. 1985, c. 277, §§ 4, 5.

On February 10, 1987, the Tribe was granted Federal recognition. See 52 Fed. Reg. 4193 (1987). Subsequently, Congress enacted its implementing legislation, the Massachusetts Indian Land Claims Settlement Act (Federal implementing Act), see 25 U.S.C. §§ 1771-1771i. In this legislation, Congress ratified and confirmed the Tribe's existence as an Indian tribe, having "a government to government relationship with the United States." *Id.* at § 1771(7). The legislation specifically stated Congress's shared desire "to remove all clouds on titles" from the Indian land claim asserted in the Federal court action. *Id.* at § 1771(3).

The Federal implementing Act required the Commonwealth to enact legislation providing that the town of Gay Head "is authorized to convey to the Secretary [of the Interior] to be held in trust for the [Tribe] . . . the Cook Lands subject to the conditions and limitations set forth in the Settlement Agreement." *Id.* at § 1771c(a)(1)(A). In addition, § 1771d(c) provides, as matter of Federal law: "*Any lands acquired pursuant to this section, and any other lands which are hereafter held in trust for the [Tribe], any successor,* or individual member, *shall be subject to* this subchapter, *the Settlement Agreement and other applicable laws*" (emphasis added). Under § 1771e(a), the Tribe:

"shall not have any jurisdiction over nontribal members and shall not exercise any jurisdiction over any part of the settlement lands in contravention of this subchapter, the

civil regulatory and criminal laws of the Commonwealth of Massachusetts, the town of Gay Head, Massachusetts, and applicable Federal laws."

The final provision of the Federal implementing Act states:

> "Except as otherwise expressly provided in this subchapter or in the State Implementing Act, the settlement lands and any other land that may now or hereinafter be owned by or held in trust for any Indian tribe or entity in the town Gay Head, Massachusetts, shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance)."

25 U.S.C. § 1771g.

The town conveyed certain property subject to the settlement agreement, including the Cook Lands, to the United States of America to be held "in trust for the Wampanoag Tribe of Gay Head (Aquinnah), formerly known as The Wampanoag Tribal Council of Gay Head, Inc., a federally recognized Indian Tribe."[8] By the express terms of the deed, the conveyance was made subject to the settlement agreement and the State and Federal implementing Acts.

The Cook Lands, approximately 7.2 acres in dimension, are bounded on the north by a tidal pond known as Menemsha Pond, and on the south by an estuary stream known as Herring Creek. The Cook Lands are located in part within the town's coastal district.

In the late 1990's, the Tribe[9] applied to the town and to the State for various permits, including permits pertaining to the

---

[8]The defendants do not dispute that the Wampanoag Tribe of Gay Head (Aquinnah) was formerly known as, and is a successor to, the Wampanoag Tribal Council of Gay Head, Inc. (Tribe), the latter entity being one of the named defendants in this suit. Because the former entity is a successor to the latter, any references to the "Tribe" encompass a reference to both entities and, for that matter, to any successor entity.

[9]At times the Tribe acted through the defendant Wampanoag Aquinnah Shellfish Hatchery Corporation (Hatchery). This distinction is one without difference, as the Hatchery is a duly chartered corporation under the Tribe's

443 Mass. 1 (2004)                                                    9

Building Inspector of Aquinnah *v.* Wampanoag Aquinnah Shellfish Hatchery Corp.

Tribe's plan to construct a shellfish hatchery[10] on the Cook Lands and, specifically, within the coastal district on the Cook Lands. The town's planning board plan review committee twice approved special permits, the building inspector issued a building permit, and the conservation commission issued a wetlands order of conditions, for the Tribe's proposed shellfish hatchery. In addition, the Tribe applied for, and was granted, a waterways license from the Department of Environmental Protection to construct the proposed shellfish hatchery and "platform." By its express terms, the license remained subject to all Federal, State, county, and municipal laws, ordinances, and regulations.

In May, 1999, the Tribe enacted its own land use ordinance, pursuant to which the Tribe's land use commission approved a permit to place a shed on the Cook Lands. In March, 2001, the Tribe began construction of a shed, measuring approximately six by eight feet, within the coastal district on the Cook Lands. The stated purpose of the shed is "to house a particulate monitor." The Tribe asserted in the trial court that it "did in fact apply for a permit from the Tribe's [l]and [u]se [c]ommission to construct the pier platform," but the record belies this statement. The record shows an application to the Tribe's land use commission to construct only a shed, and a land use permit issued by the Tribe's land use commission limited to the construction of a shed. Nonetheless, and without express authority, the Tribe commenced construction of a pier platform in Menemsha Pond.[11] The stated purpose of the pier platform is "to house a pump that pumps sea water to the Tribe's shellfish hatchery." The Tribe did not obtain a building permit or special permit *from the town* for its construction of the shed and pier platform.

On March 30, 2001, the town's building inspector and zoning

Constitution, is solely owned and controlled by the Tribe, and at all relevant times exercised authority from the Tribe.

[10]The proposed shellfish hatchery would be approximately 2,400 square feet in building size and would be "a controlled environment for the development of larval and juvenile shellfish seed . . . to stock coastal ponds on the Vineyard and in the surrounding region." The building would require a "greywater discharge system and water supply well."

[11]In their answer, the defendants make clear the location of the pier platform as being located "totally in Menemsha Pond."

officer (building inspector) served a cease and desist order on the Tribe to end its construction of the shed and pier platform. On May 1, 2001, the parties executed a stipulation in which the Tribe agreed that it would comply with the terms of the cease and desist order pending "further order of the [c]ourt." The defendants also do not dispute that they have "undertaken certain actions resulting in the issuance of cease and desist orders from the [c]onservation [c]ommission." One of the interveners has submitted information calling into question the Tribe's compliance with the stipulation concerning the building inspector's cease and desist order.

In May, 2001, the building inspector filed a verified complaint against the defendants seeking declaratory and injunctive relief. Specifically, the building inspector sought preliminary and permanent injunctions enjoining the defendants from continuing construction or use of the shed and the pier platform, and a declaration "of the extent to which the [defendants] are subject to local law . . . requiring the issuance of a building permit." The Tribe removed the case to the United States District Court for the District of Massachusetts, and the Tribe filed an answer and counterclaim. The Tribe's counterclaim sought declarations that: the Tribe is immune from the cease and desist order; the town has nonexclusive jurisdiction over the Tribe and the Cook Lands; the Tribe's rights of self-government prevent the exercise of jurisdiction over the Tribe by the town; and the town subjected the Tribe to a "deprivation of rights, privileges and immunities secured by the Constitution and laws of the United States, in violation of 42 U.S.C. § 1983." The Tribe also sought to enjoin the town from "prosecuting and exercising jurisdiction over the Tribe and enforcing the [c]ease and [d]esist [o]rder." After proceedings not relevant here, the case was remanded to the Superior Court.

Once in the State court, a Superior Court judge allowed motions to intervene filed by UMB Bank, trustee of the Thomas P. Benton Trust (UMB),[12] and by the association, and, as has been mentioned, on the motions for summary judgment, the judge dismissed the complaint and entered judgment in favor of the defendants declaring that the Tribe retains its sovereign im-

---

[12]UMB owns property abutting the Cook Lands.

443 Mass. 1 (2004)                                                    11

Building Inspector of Aquinnah *v.* Wampanoag Aquinnah Shellfish Hatchery Corp.

munity from civil suit to enforce local permitting requirements. In his decision, the judge concluded that Congress had not abrogated the Tribe's sovereign immunity, and addressed the issue of waiver in these terms:

> "It is clear from everything presented to this [c]ourt that the [t]own and the Tribe intended that the environmentally sensitive Cook Lands be subject to [S]tate and local land use requirements and that the Tribe be required to comply with the [t]own's substantive zoning laws. Common sense dictates that to effect the protection of the Cook Lands, the parties surely intended to include a meaningful remedy such as judicial review and enforcement. However . . . there is a difference between the right to demand compliance with [S]tate laws and the means available to enforce them, such that a tribe may be subject to substantive law while still retaining its immunity from enforcement of those laws in court."

The judge, noting that his decision was "patently unfair," concluded that the terms of the settlement agreement did not constitute a waiver legally sufficient to extinguish the Tribe's sovereign immunity. The judge explained that the town received "a right but no remedy, to the detriment of the citizens of not only the [t]own but the Commonwealth." This appeal followed.

1. We must determine whether the judge correctly applied a legal defense available under Federal law to an otherwise valid legal action by a local zoning enforcement officer. See *Kiowa Tribe of Okla.* v. *Manufacturing Techs., Inc.*, 523 U.S. 751, 754 (1998) (stating tribal sovereign immunity is matter of Federal law). The issue depends on an interpretation of a written agreement (in light of Federal law) together with the effect of its implementing legislation, matters that require de novo review. See generally *Leblanc* v. *Friedman*, 438 Mass. 592, 596 (2003); *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934).

2. Did the Tribe waive sovereign immunity? Before answering this question, we summarize pertinent legal principles. It is important to first recognize the unique status held by tribes. "The status of the tribes has been described as 'an anomalous one and of complex character,' for despite their partial assimilation into American culture, the tribes have retained 'a semi-

independent position . . . not as States, not as nations, not as possessed of the full attributes of sovereignty, but as separate people, with the power of regulating their internal and social relations . . . .' " *White Mountain Apache Tribe* v. *Bracker,* 448 U.S. 136, 142 (1980), quoting *McClanahan* v. *Arizona State Tax Comm'n,* 411 U.S. 164, 173 (1973). As such, tribal sovereign immunity is governed by its own distinctive law. Tribal sovereign immunity is to be distinguished from State sovereign immunity, see *Kiowa Tribe of Okla.* v. *Manufacturing Techs., Inc., supra* at 756, and the sovereign immunity of foreign nations, see *C & L Enters., Inc.* v. *Citizen Band Potawatomi Indian Tribe of Okla.,* 532 U.S. 411, 421 n.3 (2001) (*C & L Enters.*).

"Suits against Indian tribes are . . . barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation." *Oklahoma Tax Comm'n* v. *Citizen Band Potawatomi Indian Tribe of Okla.,* 498 U.S. 505, 509 (1991). "To abrogate tribal immunity, Congress must 'unequivocally' express that purpose." *C & L Enters., Inc., supra* at 418, quoting *Santa Clara Pueblo* v. *Martinez,* 436 U.S. 49, 58 (1978). A waiver of trial immunity must be "clear." *C & L Enters., supra.* The use of talismanic words, such as the words "sovereign immunity," however, are not needed to effectuate a valid waiver. *Id.* at 420.

In determining whether a tribe has waived its immunity with sufficient clarity, courts have inquired "whether the language of [the operative agreement or clause] might have hoodwinked an unsophisticated Indian negotiator into giving up the tribe's immunity from suit without realizing that he was doing so." *Sokaogon Gaming Enter. Corp.* v. *Tushie-Montgomery Assocs., Inc.,* 86 F.3d 656, 660 (7th Cir. 1996). Determining whether an agreement is sufficiently "clear" to effectuate a valid waiver requires "that courts must take a practical, commonsense approach in attempting to separate words that fairly can be construed as comprising a waiver of tribal sovereign immunity from words that fall short." *Ninigret Dev. Corp.* v. *Narragansett Indian Wetuomuck Hous. Auth.,* 207 F.3d 21, 31 (1st Cir. 2000). Taken together, the cases require that waiver be found when expressed in a way that could not unfairly surprise a tribe.

Here, the facts clearly establish a waiver of sovereign im-

munity stated, in no uncertain terms, in a duly executed agreement, and the facts show that the Tribe bargained for, and knowingly agreed to, that waiver. There is absolutely nothing to suggest that the Tribe was "hoodwinked" or that its negotiators were "unsophisticated" or did not know what they were doing. From all that appears in the record, the parties, represented by able counsel, engaged in protracted and difficult negotiations which produced the settlement agreement bespeaking, in unambiguous terms, the parties' complete understanding.

More specifically, the Tribe expressly memorialized a waiver of its sovereign immunity, with respect to municipal zoning enforcement, by agreeing, in paragraph three of the settlement agreement, to hold its land, including the Cook Lands, "in the same manner, and subject to the same laws, as any other Massachusetts corporation."[13] This language is clear and the words "in the same manner" convey a special, known, and obvious meaning. These words are used by the United States and by the Commonwealth to waive sovereign immunity. See 28 U.S.C. § 2674 (2000) ("The United States shall be liable, respecting the provisions of this title relating to tort claims, *in the same manner* and to the same extent *as* a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages" [emphasis added]); G. L. c. 258, § 2 ("Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, *in the same manner* and to the same extent *as* a private individual under like circumstances, except that public employers shall not be liable . . . for any amount in excess of one hundred thousand dollars" [emphasis added]). The words are also similar to the type of language found by the United States Supreme Court to abrogate (we use this word because the language appeared in a *statute*) a tribe's sovereign immunity from a State statute of limitations. See *South Carolina* v. *Catawba Indian Tribe, Inc.*, 476 U.S. 498, 504-506, 510 (1986) (concluding that language in 25 U.S.C. § 935, providing that "the laws of the several States

---

[13]Our conclusion that sovereign immunity was waived obviates a determination on the issue of abrogation.

shall apply to [the Catawba Tribe and its members] in the same manner they apply to other persons or citizens within their jurisdiction," obligated the Catawba Tribe to comply with a State's statute of limitations with respect to that tribe's land claim). The parties knew what they were doing when they used the language and meant the language to have the effect of waiving the Tribe's immunity as to matters relating to land use.

The "in the same manner" language cannot, of course, be read alone. The language further describing and qualifying the words imports significant meaning, namely, the manner of treatment of the Tribe, here, "in the same manner . . . *as any other Massachusetts corporation*" (emphasis added). This choice in designation constitutes an express agreement by the Tribe to be treated as a Massachusetts corporation, a status of obvious legal significance, namely a status permitting the Tribe to sue or be sued, thereby waiving tribal sovereign immunity. See G. L. c. 155, § 6 ("A corporation may, in its corporate name, sue and be sued, appear, prosecute and defend to final judgment or decree and execution . . ."). In paragraph three of the settlement agreement, the parties agreed to the permanence of this status and did so expressly in contemplation of possible Federal recognition of the Tribe:

> "Under no circumstances, *including any future recognition of the existence of an Indian tribe in the Town of Gay Head*, shall the civil or criminal jurisdiction of the Commonwealth of Massachusetts, or any of its political subdivisions, over the settlement lands, or any land owned by the Tribal Land Corporation in the Town of Gay Head, or the Commonwealth of Massachusetts, or any other Indian land in Gay Head, or the Commonwealth of Massachusetts, be impaired or otherwise altered . . . ." (emphasis added).

The Federal implementing Act was expressly made subject to the terms of the settlement agreement. See 25 U.S.C. § 1771d (c). The Tribe's agreement to be treated as a Massachusetts corporation for these purposes was accepted, and adopted by

443 Mass. 1 (2004) 15

Building Inspector of Aquinnah *v.* Wampanoag Aquinnah Shellfish Hatchery Corp.

Congress.[14] See *id.* The Federal implementing Act also bound all successors to the land, including the Cook Lands, to the settlement agreement. See *id.* at § 1771e(b) ("Any tribe or tribal organization which acquires any settlement land or any other land that may now or in the future be owned by or held in trust for any Indian entity in the town of Gay Head, Massachusetts, from the Wampanoag Tribal Council of Gay Head, Inc. shall hold such beneficial interest to such land subject to the same terms and conditions as are applicable to such lands when held by such council"). The Federal legislation implemented the settlement agreement and confirmed the terms agreed to by the parties. Contrary to the Tribe's contention, paragraph three of the settlement agreement does not express an aspiration or standard for governance of the tribal lands, which the Tribe may elect to follow. Paragraph three is an obligation undertaken by the Tribe and refers specifically to the manner in which the Tribe pledged to conduct its activities on the subject land, waiving its right to proceed otherwise. The contractual mandate that the Tribe "shall hold" its lands "in the manner" of a corporation conveys to the Tribe itself the rights and perils of ordinary corporate status.

Although the Tribe may not desire the precise result now occurring, the Tribe's agreement had a "real world objective" and "practical consequence."[15] *C & L Enters.*, *supra* at 422. The Tribe certainly must (and should) have contemplated the effect of the "in the same manner" language because when it executed

---

[14]For this very reason we reject the defendants' contention that by virtue of the Cook Lands being held *in trust*, the Tribe cannot be sued for noncompliance with local zoning laws. While land held in trust for the benefit of a Federally recognized tribe is usually not subject to local zoning or regulatory requirements, that rule gives way to a tribe's waiver, see *Connecticut* v. *United States Dep't of the Interior*, 228 F.3d 82, 85-86 (2d Cir. 2000), cert. denied, 532 U.S. 1007 (2001), which we conclude occurred here.

[15]A lay individual would have had no trouble recognizing that paragraph three of the settlement agreement authorizes suit against the Tribe. It was common knowledge in 1983, as it is today, that a corporation may sue and be sued. In 1983, the members of the Tribe were members of a corporation, actively seeking to become members of a federally recognized tribe. It would have been readily apparent to them that a corporation and a tribe have very different rights. Any "practical, commonsense approach," *Ninigret Dev. Corp.* v. *Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 31 (1st Cir. 2000), to the facts in this case reveals clear waiver, and there is no possibility that the Tribe waived its immunity unwittingly, see *Sokaogon Gaming Enter. Corp.* v. *Tushie-Montgomery Assocs., Inc.*, 86 F.3d 656, 660 (7th Cir. 1996).

the settlement agreement, the Tribe was not a Massachusetts corporation, but rather a Massachusetts *nonprofit* corporation.[16] The two types of entities are distinct and are governed by different statutory provisions. Compare G. L. c. 155, c. 156, and c. 156B (governing business corporations), with G. L. c. 180 (governing charitable corporations). An actual change in corporate status for the Tribe would have entailed a relinquishment of several privileges and exemptions accorded to nonprofit corporations and not accorded to so-called "ordinary" business corporations. See, e.g., G. L. c. 59, § 5 (providing to charitable corporations exemption from taxes on real and personal property). At the same time, however, such a change of status for the Tribe presumably would have given it the benefits of "ordinary" corporate status. The Tribe cannot now evade its bargained for, agreed to, status — namely, a nonprofit corporation, but the equivalent of a corporation with respect to its holding the settlement lands — by claiming a consequence not foreseen in 1983. Further, the stipulated status of a Massachusetts corporation, as relating to sovereign immunity, benefits the Tribe in that it forecloses (subject to certain limited exceptions) suits against individual agents or officers of the Tribe that might otherwise be permissible absent a waiver of immunity. See *Oklahoma Tax Comm'n* v. *Citizen Band Potawatomi Indian Tribe of Okla.*, *supra* at 514. By employing the "in the same manner . . . as" language in paragraph three of the settlement agreement, the parties ensured, in unequivocal wording, that the Tribe would have no special status in its land holdings different from an ordinary Massachusetts business corporation. That status confers, inter alia, the right to sue and be sued, and thus waives the Tribe's sovereign immunity with respect to its land use activities on the Cook Lands.

Because we have concluded that the Tribe waived its

[16]Some three months after oral argument, the Tribe has filed a supplemental letter under Mass. R. A. P. 16 (1), as amended, 386 Mass. 1247 (1982), to inform us that the Tribe was dissolved by a judgment entered by this court on March 22, 1996, some thirteen years after executing the settlement agreement. This fact is irrelevant to the decision. The subsequent form the Tribe assumed has no bearing on the form it took at the time it executed the settlement agreement, and does not alter the fact that the Tribe had full authority both to settle disputes and to bind its successors. The form taken by its successors, thus, is insignificant.

443 Mass. 1 (2004)                                              17

Building Inspector of Aquinnah *v.* Wampanoag Aquinnah Shellfish Hatchery Corp.

sovereign immunity as to land use on the Cook Lands, we need not discuss in detail the additional argument that the Tribe waived its sovereign immunity by executing a settlement agreement that incorporated by reference the town's zoning bylaw, which, in turn, expressly provides for judicial review and enforcement. This argument, however, has persuasive force and further supports our conclusion that, with respect to sovereign immunity, the Tribe knowingly bargained for, and fully understood, its obligations under the settlement agreement to submit to local zoning enforcement, and judicial action, where necessary.

3. The order on the cross motions for summary judgment and the resulting judgment are vacated. The case is remanded to the Superior Court for (1) entry of a judgment declaring that the Tribe, with respect to its land use activities on the Cook Lands, waived its sovereign immunity and that the defendants are not immune from the zoning enforcement action as to these lands; and (2) further proceedings consistent with this opinion.

*So ordered.*

IRELAND, J. (dissenting). I stand with the Wampanoag Tribal Council. I would affirm the trial judge's order and judgment because I conclude, as did the judge, that the settlement agreement does not constitute a legally sufficient waiver of the Tribe's sovereign immunity. I fully appreciate the language in the settlement agreement, including the language that refers to future recognition of the Tribe, as well as the court's analysis of the phrase "in the same manner, and subject to the same laws, as any other Massachusetts corporation." Nonetheless, I dissent.

The court is correct that the Tribe need not have used "talismanic words" to waive its sovereign immunity. *Ante* at 12. Cases where Native American tribes have explicitly stated that disputes would be handled in a particular forum meet the "practical, commonsense approach" to waiver. See, e.g., *C & L Enters., Inc.* v. *Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 423 (2001) (under agreement it signed, Tribe's clear consent to arbitration and to the enforcement of arbitral

18                                          443 Mass. 1 (2004)

Building Inspector of Aquinnah *v.* Wampanoag Aquinnah Shellfish Hatchery Corp.

awards in State court constitutes waiver of sovereign immunity); *Ninigret Dev. Corp.* v. *Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 30-31 (1st Cir. 2000) (under contract, Tribe's agreement to submit "[a]ll claims, disputes" to arbitration and that agreement "shall be specifically enforceable under prevailing arbitration law" constitutes waiver of sovereign immunity). The settlement agreement, as I read it, is not so "direct, clear, and unavoidable." *Id.* at 31.

The court states, and I do not disagree, that the parties negotiating the settlement agreement were sophisticated. *Ante* at 12-13, 15-16 & n.15. Based in part on this assumption, the court concludes that Tribe must have contemplated the effect of the "in the same manner" language because it agreed to establish a corporation that, by implication, would have meant a change in status for the Tribe. *Ante* at 15-16. The court also states that it finds persuasive the fact that the settlement agreement incorporates the town's zoning bylaws by reference (which expressly provides for judicial review and enforcement). *Ante* at 16-17.

However, I remain unpersuaded for two related reasons. First, at the time the settlement agreement was signed, the Tribe had not yet received Federal recognition. Therefore, it had no sovereign immunity to waive.[1] Second, given the sophistication of the parties who clearly anticipated that recognition might occur in the future, it would have been very easy for the parties to have addressed the impact of such recognition in a more straightforward fashion. It would have been simple for them to have said, "The tribe waives its sovereignty immunity." The absence of such a clear, unequivocal, explicit, "direct" and "unavoidable" statement of waiver is, in my opinion, controlling, given the importance of the rights at stake. Moreover, to read a waiver of sovereign immunity derivatively, as the court has done, reminds me somewhat of having one party's interpretation of the fine print of a contract brought to the other party's attention just after that party assented to the contract.[2]

---

[1]I note that the cases cited by the parties holding that tribes have waived their sovereign immunity are cases where the tribes involved already had Federal recognition. See, e.g., *C & L Enters., Inc.* v. *Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 414 (2001).

[2]In *C & L Enters., Inc.* v. *Citizen Band Potawatomi Tribe of Okla., supra* at

Cf. *State* v. *Narragansett Indian Tribe*, 19 F.3d 685, 691 (1st Cir. 1994).

I am not convinced that the Tribe clearly, explicitly, and unequivocally waived its sovereign immunity. In addition, although it is not part of the issue before the court, I am aware of the historic relationship between Native Americans and the government, as well as their chronic disparity in bargaining power.[3] Therefore, I prefer to err on the side of caution. Accordingly, I respectfully dissent.

---

417-418, 423, although the United States Supreme Court held that a tribe waived its sovereign immunity where it gave clear consent to submit disputes to arbitration as well as consented to the enforcement of arbitral awards in State court, it did not explicitly overrule the holding in *Pan Am. Co.* v. *Sycuan Band of Mission Indians*, 884 F.2d 416, 419 (9th Cir. 1989), and cases cited (contract provision stating that the parties agreed to subject themselves to the jurisdiction of the rules and regulations of the American Arbitration Association not unequivocal expression of tribal consent to suit). Cf. *Rosebud Sioux Tribe* v. *Val-U Constr. Co. of South Dakota*, 50 F.3d 560, 562 (8th Cir.), cert. denied, 516 U.S. 819 (1995) (contractual clause stating, "All [disputes] shall be decided by arbitration in accordance with [rules] of the American Arbitration Association" is clear intent to waive sovereign immunity because arbitration rules state that parties to the rules consent to have judgment enter in a court). See also *American Indian Agricultural Credit Consortium* v. *Standing Rock Sioux Tribe*, 780 F.2d 1374, 1380-1381 (8th Cir. 1985) ("To derive an express waiver of sovereign immunity from a promissory note that merely alludes to 'rights and remedies provided by law,' that provides for attorney fees in the event of a collection action, and that contains a choice of law provision, simply asks too much").

[3]The commonly cited example is the sale of Manhattan Island to the Dutch for the equivalent of twenty-four dollars by Native Americans. See generally Cassidy, The Enforcement of Aboriginal Rights in Customary International Law, 4 Ind. Int'l & Comp. L. Rev. 59, 75-76 n.95 (1993).