NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-909

ADOPTION OF IRMA (and three companion cases[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from decrees issued by a judge of the Juvenile Court terminating her parental rights to the four children.  On appeal, the mother claims that the judge erred by (1) denying her motion to continue the care and protection trial, (2) declining to order adequate posttermination and postadoption visitation, and (3) failing to make an independent inquiry into the adequacy of the notices served by the Department of Children and Families (department) under the Indian Child Welfare Act (ICWA).  The two oldest children, Irma and Lola, appeal from the termination of the mother's parental rights as to them.  They concede that the mother was unfit at the time of trial, but argue that the judge erred in finding that (1) the mother's unfitness was likely to continue to a near

---

[1] Adoption of Lola, Adoption of Marnie, and Adoption of Nathan. The children's names are pseudonyms.

certitude, and (2) the department's plans of adoption by recruitment were in their best interests.  We affirm.

Background.  We recount the relevant facts, reserving certain details for later discussion.  The children, Irma (born 2007), Lola (born 2010), Marnie (born 2013), and Nathan (born 2014), are the biological children of the mother.  Irma's birth father was unknown at the time of trial; Lola's father is Alan; Marnie's father is Brian; and Nathan's father is Colin.[2]  Between 2017 and 2018, the mother had three children with David, the oldest of whom, Amy,[3] passed away in 2019.  The mother and David's twins, born in March, 2018, are the subjects of a separate care and protection proceeding, they are not subjects of the present appeal.  Prior to trial, the judge denied the department's motion to consolidate the two matters.

The mother's long history with the department began in 2007 when the maternal grandmother (grandmother) physically assaulted the mother in the presence of Irma.  Since then, the mother has been the subject of more than thirty reports filed pursuant to G. L. c. 119, § 51A (51A reports), alleging neglect of the children due to domestic violence, mental health and behavioral issues, and criminal activity.  Many of the reports stemmed from

_____

[2]The fathers' names are pseudonyms; none of them are parties to this appeal.
[3] David's and Amy's names are pseudonyms.

2

incidents of verbal and physical abuse in the mother's familial and romantic relationships, primarily with the fathers of her children and the grandmother. In the summer of 2016, due to increasing concerns about violence in the mother's relationship with David, the department created a domestic violence safety plan with the mother and recommended that she no longer interact with him. The mother did not comply, and between October 2016 and February 2017, filed at least seven police reports due to David's violence, threats, and harassment.

In June 2017, the department filed the underlying care and protection petition and obtained temporary custody of the children and two month old Amy after Irma (age ten) called 911 reporting that David came to the home, banged on the door, demanded to see the children, and strangled the mother. Immediately following the children's removal, the mother was noncompliant and aggressive with the department.[4]

In March 2018, while the children remained in the department's custody, the mother gave birth to twins with David. At the time of the birth, the mother had an active abuse prevention order against David and repeatedly denied his paternity of the twins to the department. However, after a 51A

_____

[4] In July 2017, the department required that police supervise the mother's visits with the children after she threatened to kill her social worker and the social worker's family.

3

report was filed alleging neglect of the twins, the department conducted an investigation pursuant to G. L. c. 119, § 51B (51B investigation), learned of David's paternity, and supported the allegations of neglect based on the mother's history of domestic violence with David.  The department filed another care and protection petition and obtained temporary custody of the twins before they were discharged from the hospital.

Following the twins' removal, the mother was again hostile and aggressive with the department.  Between July 2018 and February 2019, the mother engaged inconsistently in services, and had significant police involvement due to her violent relationship with David.  It was not until around March 2019 that the mother began to consistently engage with the department, attend visits with the children, and show insight into her past behavior.  During the period between March and July 2019, the mother's home was appropriate for the children and was observed to be clean and clutter-free.  The mother made significant progress, and in May 2019, the goal for the children was changed from adoption to reunification.  By December 20, 2019, all of the children were reunified with the mother.

Between December 20 and 27, 2019, the mother contacted the department several times to express concerns about Amy (age two)

4

exhibiting "unusual" behavior.[5]  The department told the mother to seek help including, on December 27, advising her to seek medical attention for Amy.  The mother did not do so.  On December 28, she called 911 and reported that Amy was unresponsive.  When an ambulance arrived, Amy was not breathing and did not have a heartbeat.  The other children watched as emergency responders helped Amy regain a pulse; she remained unconscious.  Amy was then hospitalized, placed on life support, and diagnosed with nonaccidental abusive head trauma.  The examining physicians also raised concerns about the presence of non self-inflicted scratches and marks on Amy's body.  Amy was determined to be brain dead on December 29 and passed away on December 31, 2019.  Several 51A reports were filed alleging physical abuse of Amy by the mother, and following a 51B investigation, the department supported the allegations.  The mother was charged with manslaughter and reckless endangerment of a child in connection with Amy's death.[6]

After the judge denied the mother's motion to continue the trial until after the resolution of her criminal charges, the Juvenile Court case was tried over four days in June and July 2021.  The judge found the mother unfit, terminated her parental

---

[5] In particular, the mother reported that Amy would not eat and was head banging, scratching herself, staring off, replying "yes" to everything, and having accidents on the furniture.
[6] The case remained open at the time of trial.

5

rights to the children, and approved the department's adoption plans for Irma, Lola, and Nathan. The judge also terminated the parental rights of all the fathers with the exception of Brian, who was granted permanent custody of Marnie. The judge ordered quarterly sibling visitation among all the siblings, including the twins. The judge declined to order posttermination or postadoption visitation between the mother and Marnie and Nathan. However, recognizing the bond that Irma and Lola shared with the mother, the judge ordered one supervised posttermination and postadoption visit per year between each of them and the mother, at each daughter's request.

Discussion. 1. Termination of the mother's parental rights. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "We review the judge's findings with substantial deference, recognizing her discretion to evaluate a witness's credibility and to weigh the evidence," Adoption of Nancy, 443 Mass. 512, 515 (2005), "and reverse only where the findings of fact are clearly erroneous or where there is a clear

6

error of law or abuse of discretion."  Adoption of Ilona, 459 Mass. 53, 59 (2011).

a.  Motion to continue.[7]  The mother maintains that the judge abused her discretion in denying the motion to continue the trial.  The crux of this argument is that the judge failed to consider that the mother would be deprived of the ability to engage with the department or present evidence of her fitness without incriminating herself in Amy's death.  We are unpersuaded.

"Whether to continue any judicial proceeding is a matter entrusted to the sound discretion of the judge, and [her] decision will be upheld absent an abuse of that discretion." Care & Protection of Quinn, 54 Mass. App. Ct. 117, 120 (2002). In evaluating a motion to continue, "the judge should 'balance any prejudice to the other civil litigants which might result from granting a stay, against the potential harm to the party claiming the privilege if he is compelled to choose between defending the civil action and protecting himself from criminal prosecution.'"  Id. at 122, quoting United States Trust Co. of N.Y. v. Herriott, 10 Mass. App. Ct. 313, 317 (1980).

---

[7] The mother also challenges the judge's denial of the department's motion to consolidate this matter with the care and protection proceeding concerning the twins.  Because the mother did not raise this issue below, it is waived.  See Adoption of Mary, 414 Mass. 705, 712 (1993).

7

The judge denied the mother's motion because the case had been pending since 2017 and the children were "entitled to have some permanency."  The judge properly considered that the harm of delays in termination proceedings "is unfortunately suffered principally by the children," Adoption of Don, 435 Mass. 158, 170 (2001), that a resolution of the mother's criminal case might take some time, and that "[n]o cases of any kind have a greater claim for expedition at all stages than those involving care and custody of children."  Custody of a Minor, 389 Mass. 755, 764 n.2 (1983).  See Care & Protection of Quinn, 54 Mass. App. Ct. at 122.  In the circumstances, the judge did not abuse her discretion in determining that the interests of the children in permanency outweighed the mother's desire to resolve the criminal case before testifying.  See Adoption of Nancy, 443 Mass. at 517 ("it is only fair to the children to say, at some point 'enough'").

Our conclusion is bolstered by the fact that, given the mother's extensive history with the department, the judge could reasonably have concluded that evidence of her fitness "could have been presented by other witnesses or documentation without Fifth Amendment implications."  Care & Protection of Quinn, 54 Mass. App. Ct. at 122.  There is ample evidence that the mother had an opportunity to present facts on the merits of the case, and the judge heard from the mother and others about the

8

mother's extensive history with the department and about the events leading to Amy's death, making the mother's version of those events one of a "constellation of factors" relevant to the judge's determination of her current and future fitness. Adoption of Greta, 431 Mass. 577, 588 (2000).  We see no abuse of discretion.

For the first time on appeal, the mother raises the related claims that (1) the department's action plan was designed to elicit incriminating information from her, and (2) given the pending criminal charges against the mother, the judge erred by drawing negative inferences based on the mother's refusal to engage with the department.  Because these claims were not raised in the trial court, they are waived.  See Adoption of Mary, 414 Mass. 705, 712 (1993).[8]

_____

[8] Consideration of these claims would not change our conclusion. The department's action plan was aimed at "evaluating [the mother's] fitness, while at the same time ensuring the safety of the [children]."  Adoption of Yalena, 100 Mass. App. Ct. 542, 549-550 (2021).  The mother's ability to gain insight into the circumstances of Amy's death, particularly her failure to seek timely medical attention for Amy, bore on her ability to safely care for the children, and was therefore relevant to the department's evaluation of her fitness.  Further, the record indicates that the judge drew negative inferences only from the mother's refusal to testify at trial, and it is well established that "the privilege against self-incrimination applicable in criminal proceedings, which prevents the drawing of a negative inference from a defendant's failure to testify, is not applicable in a child custody case."  Custody of Two Minors, 396 Mass. 610, 617 (1986).  After denying the motion to continue, the judge was entitled "to draw appropriate inferences from the

9

Even assuming, arguendo, that the judge had abused her discretion in denying the mother's motion to continue or in drawing adverse inferences, there was overwhelming evidence of the mother's current and likely future unfitness.

b.  Mother's unfitness.  "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age."  Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016).  In terminating parental rights, it is "appropriate for a judge to consider whether, on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary" (quotation and citation omitted).  Care & Protection of Zeb, 489 Mass. 783, 788 (2022).  "Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period."  Adoption of Ilona, 459 Mass. at 60.  Here, there was ample evidence that the mother failed to recognize the harm caused by her longstanding patterns of violence, criminal activity, and mental health and behavioral issues, which supported the judge's conclusion that the mother was currently unfit and that her unfitness was not temporary.

_____

fact that the [mother] presented no testimony."  Care & Protection of Quinn, 54 Mass. App. Ct. at 123.

10

The judge did not abuse her discretion in finding that the
mother lacked insight into the impact of domestic violence on
her and the children.  The record was replete with evidence
demonstrating that the children had long been exposed to, and
traumatized by, domestic violence both in the home and in
public.  The mother obtained abuse prevention orders against
each of the fathers and engaged in physical and verbal
altercations while caring for, and sometimes while holding, the
children.[9]  See Custody of Vaughn, 422 Mass. 590, 595 (1996) ("a
child who has been either the victim or the spectator of such
abuse suffers a distinctly grievous kind of harm").  The judge
further considered that, apart from the period of improvement
between March and December 2019, the mother engaged only
sporadically in domestic violence services.[10]  See Adoption of
Jacques, 82 Mass. App. Ct. at 608 (judge entitled to weigh
evidence of mother's improvements within context of her "earlier
and continuing deficits").  The findings that the mother (1)

_____

[9] In one instance, the mother started a physical altercation with
strangers at a restaurant that resulted in Marnie's receiving
medical treatment for a "deep, gaping, forehead laceration."
[10] Even when the mother was engaged in weekly domestic violence
services between 2017 and 2018, she continued to spend time with
an abusive partner, David, and during that time, she was
hospitalized at least once as a result of his abuse.  See
Adoption of Yvonne, 99 Mass. App. Ct. 574, 579-580 (2021) (judge
properly considered mother's history of failing to address "how
domestic violence affected her parenting" in assessing her
present and future fitness).

11

attempted to conceal her ongoing relationship with David from the department, (2) as of March 2021, denied needing domestic violence services, and was otherwise hostile and cooperative with the department, and (3) was not engaged in domestic violence services at the time of trial, supported the judge's conclusion that the mother failed to recognize the harm to her children from being exposed to domestic violence. See Adoption of Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005) ("Violence within a family is highly relevant to a judge's determination of parental unfitness and the best interests of the children").

The judge properly considered that the mother's history of violence contributed to her extensive criminal record, which included charges for assault and battery, violations of abuse and harassment prevention orders, threatening to commit crimes, and assault and battery by means of a dangerous weapon. See Care & Protection of Frank, 409 Mass. 492, 495 (1991) ("evidence of prior convictions may be properly weighed in the balance [of parental fitness]"). At the time of trial, the mother was a defendant in two open criminal cases and was incarcerated for violating the terms of her probation.[11] The judge's findings

---

[11] Pending trial on the criminal charges stemming from Amy's death, the mother was released on condition that she wear a GPS monitoring bracelet. In August 2020, the mother violated the terms of her probation by threatening a neighbor and cutting off the GPS monitoring bracelet.

12

illustrate that the mother's violent criminal activity affected her ability to be present in the children's lives and further supported the conclusion that her unfitness would likely continue indefinitely.

The judge also identified concerns about the mother's ability to manage her behavioral and mental health issues. The judge found that the mother had yelled at, sworn at, hung up on, and made violent threats to social workers and that she was agitated, disruptive, and verbally aggressive at trial.[12] The evidence of the mother's ongoing behavioral deficits supported the judge's conclusion that the mother placed the children at risk of harm through her disputes in the community and home. See Adoption of Uday, 91 Mass. App. Ct. 51, 54 (2017) (judge considered father's violent, assaultive behavior in finding him unfit).

The judge also appropriately considered the mother's mental health challenges. She was diagnosed with anxiety, bipolar disorder, depression, and posttraumatic stress disorder, and was hospitalized in 2017, 2018, and 2020 for suicidal ideation. Despite her intermittent attempts at therapy and inpatient treatment, the mother's mental health struggles persisted

---

[12] At one point, the mother was removed from the trial because she was unable to control angry outbursts and exhibited inappropriate behavior such as cursing, making threats, and interrupting testimony.

throughout this case, worsened after Amy's death, and, at the time of trial, had not been actively addressed since May 2020. Here, as in Adoption of Luc, 484 Mass. 139, 146 n.17 (2020), the concern "is not that the mother has mental health challenges, but that those challenges remained largely unaddressed," to the children's detriment.

c.  Best interests of the children.  "[T]he best interest analysis . . . requires a court to focus on the various factors unique to the situation of the individual[s] for whom it must act."  Custody of a Minor, 375 Mass. 733, 753 (1978).  "The standard for parental unfitness and the standard for termination are not separate and distinct, but 'reflect different degrees of emphasis on the same factors.'"  Adoption of Nancy, 443 Mass. at 515, quoting Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 641 (1975).  Here, the judge's findings as to the mother's future unfitness properly supported the determination that termination was in the children's best interests due to the mother's (1) inability to provide a safe or stable home environment, and (2) lack of insight into her actions.  See Adoption of Lisette, 93 Mass. App. Ct. 284, 296-297 (2018).

As part of the best interests analysis, "a 'court shall . . . consider the plan proposed by the department or other agency initiating the petition.'"  Adoption of Nancy, 443 Mass.

14

at 515, quoting G. L. c. 210, § 3 (c).  The judge individually
analyzed the department's proposed plan for each of the
children.  She considered that, at the time of trial, Marnie (1)
was living with her father, Brian, with whom she shared a strong
bond; (2) was described as "very happy [and] well cared for" by
her father; and (3) had excelled in school, visited with her
siblings, and attended biweekly therapy to address her grief.
After thoughtfully considering the department's goal for Marnie,
the judge acted within her discretion in determining that the
department failed to meet its burden of proving Brian's
unfitness, and in awarding him permanent custody of Marnie.

Although at the time of trial there were no viable kinship
placements available to Irma, Lola, or Nathan, "[t]he law does
not require that the adoption plan be 'fully developed' in order
to support a termination order."  Adoption of Varik, 95 Mass.
App. Ct. 762, 770 (2019), quoting Adoption of Willow, 433 Mass.
636, 652 (2001).

The judge thoughtfully considered the department's plans
that these three children be adopted through recruitment.  In so
doing, the judge made individualized findings about each child's
age, "complex mental health needs," and need for "stable,
continuous care," which they had not had.  The judge found that
each child suffered significant trauma from witnessing Amy's
week-long deterioration, the medical emergency, and her eventual

15

death.  The judge also found that the department had referred Irma, Lola, and Nathan to the Adoption Development and Licensing Unit (ADLU) and registered them with Massachusetts Adoption Resources Exchange (MARE) to assist with the recruitment of preadoptive families.  The department specifically sought preadoptive families with (1) an understanding of trauma, (2) the ability to provide for the children's future mental health needs, and (3) an appreciation of the bond the three children shared with one another and their other siblings.  We are satisfied that the plans submitted by the department, in combination with the overwhelming evidence presented at trial concerning the mother's unfitness, were "sufficiently specific and detailed" to support termination of the mother's rights. Care & Protection of Three Minors, 392 Mass. 704, 717 (1984).

Both Irma and Lola expressed a preference not to be adopted and argue on appeal that the judge erred in terminating the mother's parental rights to them.  While the judge "should consider the wishes of the children in making custodial determinations," Adoption of Nancy, 443 Mass. at 518, "[t]heir views . . . are neither decisive nor outcome determinative" (citation omitted).  Id.  Here, the judge considered the requests and properly determined that the department's plans were the Irma's and Lola's best interests.  The judge's termination decrees were based on an assessment of the

16

cumulative effect of the mother's neglect on Irma and Lola, their respective mental and physical health needs, and the determination that they should be protected from the uncertainty and instability of the mother's behavior in the future.

At the time of trial, Nathan was six years old and had spent most of his life in the department's custody. The judge properly considered that, of all his siblings, Nathan was closest with Amy, whom he described as "his baby," and that his behavioral issues worsened after her death. The department identified Nathan's father's cousin as a potential adoptive resource and, in its plan for Nathan, specified the need for a preadoptive family that could understand his high level of trauma and behavioral issues.

"The judge's determination that the plan of adoption submitted by the department was in the child's best interest presents 'a classic example of a discretionary decision' to which we accord substantial deference." Adoption of Peggy, 436 Mass. 690, 705 (2002), quoting Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999).

d. Posttermination and postadoption visitation. A "judge who finds parental unfitness to be established has broad discretion to determine what is in a child's best interests with respect to custody and visitation with biological family members

17

thereafter."  Adoption of Rico, 453 Mass. 749, 756 (2009).  The

purpose of posttermination and postadoption contact is not to

strengthen the bonds between the child and the mother but rather

"to assist the child[ren] as [they] negotiate[], often at a very

young age, the tortuous path from one family to another."

Adoption of Vito, 431 Mass. 550, 565 (2000).  In addition, an

order for posttermination or postadoption visitation "offers

protection to the [children] that is absent if the judge leaves

all visitation matters up to the department and future adoptive

parents."  Adoption of Rico, supra.  A "judge should issue an

order of visitation only if such an order, on balance, is

necessary to protect the child's best interest."  Adoption of

Ilona, 459 Mass. at 65.  A decision not to order posttermination

or postadoption visitation is reviewed for an abuse of

discretion.  See Adoption of Lenore, 55 Mass. App. Ct. 275, 283

(2002).[13]

Here, the judge did not abuse her discretion in crafting a

visitation order that considered both the children's interests

---

[13] The mother also maintains that the judge abused her discretion
in declining to order posttermination contact between the
children and the grandmother.  Passing on the question of the
mother's standing to raise this issue, we are unpersuaded.  The
evidence established that the grandmother was violent in front
of the children, has had minimal contact with them throughout
these proceedings, and was never approved by the department to
watch the children or have in-person contact.  See Adoption of
Vito, 431 Mass. at 561-562 (judge's equitable power to order
postadoption contact must be in best interests of child).

18

in stability and their bonds with the mother.  Following Amy's death, a District Court judge issued an order (District Court order) restricting all contact between the mother and the children.  In May 2021, the District Court order was modified to permit the mother to have supervised indirect contact with the children, but no in-person contact.  After consulting each child's therapist, the department did not support any contact between the children and the mother.[14]  At the time of trial, the mother had not had any contact with the children since December 2019.

In crafting the posttermination and postadoption visitation order, the judge considered that the mother had missed several visits with the children due to safety concerns for the department's personnel and conflicts with her criminal matter court dates; the mother was unable to control her behavior or her inappropriate outbursts during trial; the children had not had contact with the mother since Amy's death; and the children

---

[14] For the first time on appeal, Irma and Lola claim that the department failed to make reasonable efforts to reunify them with the mother.  Specifically, they challenge the department's refusal to allow any contact between them and the mother following the modification of the District Court order.  "A claim of inadequate services must be raised in a timely manner to provide the judge and the department the opportunity to make accommodations while the case is pending."  Adoption of Yalena, 100 Mass. App. Ct. at 554.  Irma and Lola did not raise this claim in the Juvenile Court, and it is therefore waived.  See id.

19

had regular sibling visitation with one another.  The judge's decision not to order visitation between the mother and Marnie and Nathan was based on evidence that the two children had spent half their lives in the department's custody, were exposed to significant trauma while in the mother's care, and required stable home environments.  The judge found that Nathan was particularly close with Amy and that the circumstances of her death were "extremely traumatizing for both [Nathan] and [Marnie]."  The judge further found that Nathan did not have as strong a bond with the mother as the other children, and that Marnie struggled to transition back to her foster home after visits with the mother.[15]

In ordering one annual visit between the mother and Lola and Irma, the judge considered that the department opposed any posttermination or postadoption contact between the mother and Lola and Irma, that they had "spent more than half their lives" in the mother's care, and that they had a "strong bond" with the mother.  There was no abuse of discretion.

Finally, the judge considered the children's respective bonds with their maternal siblings, found that their continued contact was in each of their best interests, and did not abuse her discretion in ordering sibling visitation at least quarterly

---

[15] The judge also noted that Marnie had a stable home environment and was doing well in her father's care.

20

among all the children, including the twins.  See Care & Protection of Three Minors, 392 Mass. at 715.

2.  ICAW.  The mother raises two claims under the ICWA, 25 U.S.C. § 1911 et seq.  First, she maintains that the department did not adequately investigate available evidence linking the children to a Native American tribe.  Second, she maintains that the judge ignored evidence of the children's status as Indian[16] children and erred by failing to conduct an independent inquiry under the ICWA.[17]  We are not persuaded.

"Congress enacted the . . . ICWA out of concern that an 'alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.'"  Haaland v. Brackeen, 143 S. Ct. 1609, 1623 (2023), quoting 25 U.S.C. § 1901(4).  Section 1912 of the ICWA requires that, "[i]n any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the

---

[16] We use the term "Indian" for consistency with ICWA, despite acknowledging that terms like Native American and Indigenous are preferred by many.

[17] The mother raises this claim for the first time on appeal.  We are mindful that 25 U.S.C. § 1914 allows an Indian parent to petition a court "to invalidate [any action for termination of parental rights] upon a showing that such action violated" any of §§ 1911, 1912, or 1913 of the ICWA.  Acknowledging the importance of finality in child-custody proceedings, we assume without deciding that the mother's challenge is properly before us.

21

foster placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and their right of intervention."  25 U.S.C. § 1912(a).

The mother's argument rests primarily on language in several 51A reports indicating that the ICWA was implicated. But her argument ignores the fact that the mother herself denied to the department in June 2017, and again to the judge in April 2019, that she or the children had any Indian affiliation.  For the sake of discussion, we will assume that, despite the mother's denial, the suggestion in the 51A reports, coupled with the department's 2020 family assessment, which indicated that the mother identified as being affiliated with a Cherokee tribe, gave the department "reason to know" that the children might be Indian children.

There are two avenues for a child to be an "Indian child" under 25 U.S.C. § 1903(4).  The first is to be "a member of an Indian tribe," § 1903(4)(a), and the second is to be "eligible for membership in an Indian tribe and . . . the biological child of a member of an Indian tribe," § 1903(4)(b).

Consistent with its obligations under the ICWA, the department sent notices to the three federally recognized

Cherokee tribes[18] and the Eastern Regional Bureau of Indian
Affairs, which covers a region that includes Mississippi, where
the mother maintains some Indian forebearers lived.[19] Included in
those notices was information from the mother:  the names and
birthdates of the children and of their biological parents and
their maternal grandmother and great-grandmother.  In January
2019, each of the three Cherokee tribes responded, confirming
that the children were not considered "Indian children" under
the ICWA.[20]  These responsive letters from the three Cherokee
tribes demonstrate that the department complied with the ICWA's
notice provision and foreclosed the possibility that the
children were "Indian children" under the ICWA's first avenue.[21]

---

[18] The department sent notices to the Cherokee Nation, the United
Keetoowah Band of Cherokee Indians of Oklahoma, and the Eastern
Band of Cherokee Indians.  See Adoption of Uday, 91 Mass. App.
Ct. at 52, citing Indian Entities Recognized and Eligible to
Receive Services from the United States Bureau of Indian
Affairs, 78 Fed. Reg. 26,384, 26,385, 26,388 (2013).
[19] From the name of this region, it is fair to understand that it
covers the eastern States.  Although we do not rely on
information that was not in the appellate record, this
understanding is confirmed online by the Bureau of Indian
Affairs.  "The Eastern Region's jurisdictional area consists of
the states from Maine to Florida over to Louisiana and up to
Illinois."  U.S. Department of Interior, Bureau of Indian
Affairs, Eastern Region, https://www.bia.gov/regional-office/eastern-region.
[20] As to Irma, the Cherokee Nation wrote that it was "not
possible to determine" whether Irma was eligible on her father's
side because his identity was unknown.  Because there was no
claim that Irma's unknown father was Indian, this response does
not affect our analysis.
[21] The mother maintains, in postargument briefing, that the
department ran afoul of the ICWA by failing to pursue bits of

Because the mother denied tribal membership, and there is no claim that any of the biological fathers were members of an Indian tribe, the children did not qualify under the second avenue.  In these circumstances, we cannot say that the department failed to comply with the ICWA.

In addition to the burden on the department, the ICWA places an affirmative obligation on State courts to "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child."  25 C.F.R. § 23.107(a).  Here, the judge made the necessary inquiry on April 11, 2019, and the mother denied knowing or having reason to know that she or the children had any Indian or tribal affiliation.  Even were this not sufficient to discharge the judge's duty -- a matter that we do not decide -- the judge was permitted to "rely on facts or documentation indicating a Tribal determination of membership or eligibility for membership in making a judicial determination as to whether the child is an 'Indian child.'"  25 C.F.R. § 23.108(c).  The responses from the

_____

information leading to potential familial tribal affiliations in Mississippi, and by reporting the incorrect birth date for the great-grandmother.  Because we conclude that the facts precluded the children from being considered "Indian children" under the ICWA, and because both the department and -- if required -- the judge made the relevant inquiries, we do not reach this argument.

24

tribes established that the children were not considered "Indian children."  See 25 C.F.R. § 23.108(b).  We see no error.

Decrees affirmed.

By the Court (Blake, Walsh & Hershfang, JJ.[22]),

*Joseph F. Stanton*

Clerk

Entered:  August 30, 2023.

---

[22] The panelists are listed in order of seniority.