EDWIN L. GRAY & another *vs.* ARTHUR M. HANDY
& another.

Barnstable.    April 6, 1965. — June 25, 1965.

Present: WILKINS, C.J., WHITTEMORE, KIRK, SPIEGEL, & REARDON, JJ.

*Easement.    Profit à prendre.    Deed,* Construction.    *Words,* "Privilege."

Under a conveyance of a swamp area intended for conversion into cran-
berry bogs together with the privilege of flowing the swamp from a
lake and draining the swamp and "the privilege of taking sand from
the [remaining] lands of the . . . [grantor] for sanding said swamps
and building dike along the edge of" the lake, the "privilege" of taking
sand was a grant of a profit à prendre appurtenant to the grantee's
land which did not terminate when the bogs and the dike were built
but passed to successive owners of that land.

PETITION filed in the Land Court on November 13, 1962.
The case was heard by *Cotton,* J.

*Allan M. Hale (Robert J. Tilden* with him) for the re-
spondents.

No argument or brief for the petitioners.

SPIEGEL, J.    This is a petition under G. L. c. 185 to reg-
ister title to certain land, hereinafter called the locus.    The
respondents claim, inter alia, "the right to remove sand
from the . . . [locus] for purposes of cranberry culture
on the bogs lying southwest . . . [thereof]."    The Land
Court ruled, inter alia, that the petitioners "are entitled to
have the . . . [locus] registered free from any . . . right
of the respondents to dig and remove any sand therefrom";
and the respondents appealed.    The evidence is reported.

We summarize the pertinent facts from the Land Court's
decision.    Much of the locus and part of the abutting land
of the respondents were owned by the Wing family prior
to 1868.    In 1868 the Wings conveyed part of the respond-
ents' land to the respondents' predecessor in title, Charles
Miller.    The conveyance as described in the deed consisted
of "a swamp area and Little Round Swamp" "[t]ogether

with the privilege of raising the Lake two feet for the pur-
pose of flowing said swamps, and also to drain said swamps
Northerly to the Pond, known as Dam Pond, together with
the privilege of taking sand from the lands of the party of
the first part for sanding said swamps and building dike
along the edge of said Lake, and the Party of the second
part is to build and maintain the fence along the road by
the large swamp and half of the fence of the Little Round
Swamp, and the party of the first part to build and main-
tain the other half of the fence.'' By another deed of 1868,
Samuel Eldred conveyed to Miller ''five acres of swamp''
in the same area, including part of Little Round Swamp,
and granted the ''privilege of flooding and draining said
swamp and also obtaining sand outside of said boundaries
for building roads and sanding said swamp.'' By still an-
other deed of 1868, one Crowell conveyed a swamp area to
Miller and ''[a]lso a swamp lying north of said swamp . . .
known as the Little Round Swamp, bounded by the upland
with the privilege of flooding, draining and obtaining sand
for the dyking and sanding said swamps.'' Miller pro-
ceeded to construct two bogs and took sand therefor from
old pits on the locus. He could ''take sand from land of
each grantor for the benefit of [only] the area purchased
from such grantor.'' He died in 1914, devising his estate
to his children. ''The inventory . . . [included] about
twenty-five acres of [c]ranberry [b]og,'' including the two
bogs already mentioned. Miller's children in 1926 con-
veyed by deed seven bogs to the Linnell Cranberry Com-
pany, and also granted thereby ''any and all rights of tak-
ing sand from adjoining owners.'' The company in 1930
conveyed the land to the respondents' father, who, relying
upon his deed, shortly thereafter opened the presently
existing sandpit on the locus. Until then no sand had been
taken from the locus for over sixty years.

The Land Court found that the intention of the grantors
in the deeds to Miller of the swamp areas was to enable
Miller to ''convert them into cranberry bogs,'' that ''the
intent and purpose of the 'privilege' was to allow him to
take sufficient sand from the three owners' remaining land

to accomplish the building . . . [of the bogs] and [of] necessary roads and dykes,'' and ''that the purposes of said privilege were accomplished and terminated many years ago.'' The respondents contend that the deed from the Wings to Miller in 1868 was an express grant of a profit à prendre in the locus which has not been terminated.

''Every deed is to be construed so as to give effect to the intent of the parties as manifested by the words used, interpreted in the light of the material circumstances and pertinent facts known to them at the time it was executed.'' *Bessey* v. *Ollman,* 242 Mass. 89, 91. *Allen* v. *Wood,* 256 Mass. 343, 349. *Morehardt* v. *Dearborn,* 313 Mass. 40, 47. *Walker* v. *Sanderson,* 348 Mass. 409, 412. Nothing in the evidence reported tends to affect the meaning of the words of the grant in question. The language of the deed is plain that there was a grant of ''the privilege of taking sand from the lands of the party of the first part [namely, that portion of the locus owned by the Wings in 1868] for sanding said swamps and building dyke.'' The deed contains no provision which limits the exercise of this privilege to a certain period or for the life of the grantee. The grant of the commensurate, unlimited ''privilege of raising the Lake two feet for the purpose of flowing said swamps, and also to drain said swamps'' indicates that a continuous and perpetual operation was contemplated in connection with and for the benefit of the granted swamps. The sweeping language of these provisions, as well as of those in the other deeds to Miller in 1868, militates against the inference which was drawn by the Land Court, that ''the intent and purpose of the 'privilege' was [only] to allow . . . [Miller] to take sufficient sand . . . to accomplish the building . . . [of bogs] and [of] necessary roads and dykes.'' The deed in question could have expressly so limited the extent of the privilege, but did not do so. Contrary to the intimation of the Land Court, the use in the deed of the word ''privilege'' does not affect the legal result of the grant. See *Phillips* v. *Rhodes,* 7 Met. 322, 323–324. Therefore, we are of opinion that the provision relating to the sanding privilege was a grant to Miller of a profit à prendre

appurtenant to the land granted to him by the Wings.

"A profit [à prendre] is a right in one person to take from the land of another either a part of the soil, such as minerals of all kinds from mines, stones from quarries, sand and gravel; or part of its produce, such as grass, crops of any kind, trees or timber, fish from lakes or streams, game from the woods, seaweed, and the like. . . . A profit [à prendre] is appurtenant when created for the benefit of a dominant estate. It is then in all respects, except the character of the user, of the same nature as an easement, passing with the dominant estate as an incident thereof whenever the estate passes by deed, devise or inheritance, so that the person entitled to the enjoyment of the profit at any time will be the person who is at that time the immediate owner of the dominant estate." Walsh, Commentaries on the Law of Real Property, § 229. *Phillips* v. *Rhodes,* 7 Met. 322, 323–324. *Goodrich* v. *Burbank,* 12 Allen, 459, 461. Tiffany, Real Property (3d ed.) §§ 839, 840. Restatement: Property, § 450, special note, comments f and g. Jones, Easements, § 49. See *Foster* v. *Lee,* 271 Mass. 200, 204–205.

A conveyance of a profit à prendre is to be distinguished from a "conveyance of an interest in real estate which will give complete ownership of a valuable part of the property, while at the same time . . . [the owner] may retain his general ownership of the whole tract for other purposes which do not interfere with the rights which he conveys. Minerals, mines, quarries and other similar portions of the estate may be conveyed even in fee, while the rest is retained." *Hunt* v. *Boston,* 183 Mass. 303, 305. See *Adam* v. *Briggs Iron Co.* 7 Cush. 361, 365–367; *White* v. *Foster,* 102 Mass. 375, 377–380; *Chester Emery Co.* v. *Lucas,* 112 Mass. 424, 435; *Lamb* v. *Pierce,* 113 Mass. 72, 73–74; *Smith* v. *Wells,* 250 Mass. 151, 155; Tiffany, Real Property (3d ed.) §§ 587, 846. Cf. *Cretecos* v. *Lucia,* 335 Mass. 678. So also, a profit à prendre is to be distinguished from a mere license to enter upon the land and remove portions thereof. *White* v. *Foster,* 102 Mass. 375, 378–380. Tiffany, Real Property (3d ed.) § 840. The reference to a profit à

prendre as a "license" in *Stockbridge Iron Co.* v. *Hudson Iron Co.* 107 Mass. 290, 322, was a misnomer (see Tiffany, Real Property [3d ed.] § 588) since a license, unlike a profit à prendre, creates no interest in the land, and is revocable not only at the will of the owner of the property on which it is exercised, but also by his death or by his alienation or demise of the land. *Nelson* v. *American Tel. & Tel. Co.* 270 Mass. 471, 480. *Scioscia* v. *Iovieno,* 318 Mass. 601, 603. *Van Szyman* v. *Auburn,* 345 Mass. 444, 449.

We conclude that the locus is to be registered subject to the profit à prendre of the respondents in that portion of the locus originally owned by the Wings. The decision of the Land Court is to be modified accordingly, and as so modified is affirmed.

*So ordered.*