Berry, J.
From the earliest time, the members of the Wampanoag Tribe of Gay Head (now known as Aquinnah) in Martha’s Vineyard (Gay Head Tribe or Tribe) had a custom and practice of common access across the lands that are the subject of this appeal. For the reasons that follow, we conclude that the ancient origins of that common access — dating back before the late eighteenth century — establish the equivalent of a chain of title, with access rights that would not yield landlocked parcels. The late nineteenth century State statutory conveyance of large tracts of public common land in Aquinnah, including the subject lands, by the Legislature as grantor to the newly enfranchised Gay Head Tribe members as grantees, and the subsequent judicial partitioning of these govemmentally conveyed lands did not, we determine, break these preexisting access rights. More specifically, the subsequent grantees of land tracts in the links of this chain of conveyances from the Gay Head Tribe members to the present plaintiffs were not divested of these long-held access rights flowing from the long-standing tribal custom and practice so as to leave the plaintiffs’ lots landlocked and bereft of easements.
It is so that a plumb line — with perfectly fit easements in the precise transverse of paths walked by and through the lands by the Gay Head Tribe members, in their custom and practice — would, in this present time, be most difficult to reconstruct by metes and bounds since property boundaries were not set in that manner in the statutory governmental conveyances and subsequent judicial partition that deeded the lots to the Gay Head Tribe members in severalty. But such precision, following the paths of the Gay Head Tribe’s custom and practice, is not required under the legal doctrine of easements by necessity that underlies the Restatement (Third) of Property (Servitudes) (Restatement) §2.15 (2000) and Massachusetts common law. We remand to the Land Court to draw the necessary easement lines in accord with these legal doctrines — a practice well within the great skills of that court.
*12 To summarize the reasons for our conclusion that easements by necessity exist, as discussed in more detail infra: (1) It is absolutely undisputed that common access right by custom and practices existed among the Gay Head Tribe members over the lands in question. Accordingly, there would not have been any need for restatement of the access rights in the conveyance documents, given the preexisting access over the subject lands. (2) The Gay Head Tribe members, first as grantees, and then as grantors, would not be expected to manifest expressed or implied intent regarding easements, nor would intent be manifest in the governmental land transfers to the Tribe members or in the later judicial partitioning process, which changed common ownership to yield individual deeds in severalty ownership to the Tribe members. (3) Even were we to disregard the history of common access as laying the predicate for easements by necessity to avoid land-locking, it is appropriate to turn to and follow § 2.15 of the Restatement, which provides that an easement by necessity exists where access would otherwise be cut off unless the parties clearly indicate they intended a contrary result. (4) Lastly, even apart from the Restatement, Massachusetts property common law also supports easements by necessity in the subject parcels.
1. The Gay Head Tribe’s tradition of common access over the subject lands. First, it is not disputed — to the contrary it is definitely acknowledged on this record — that the prevailing custom of the Gay Head Tribe was to allow its members access over the lands. There is no evidence in the record that this prevailing custom, prior to the governmental partition that occurred in the 1870s, did not continue after the land, previously held in common, was partitioned and deeded to Tribe members.
In light of this land use fact as to which there is no dispute, any intent regarding affirmative easements would not have been expressed because there was no need to do so, with the extant Tribe members’ common access over the lands.[4] There is neither any basis to negate this undisputed fact nor any basis to negate ease *13 ments by necessity simply because way back in the historic lore — which encompasses the Gay Head Tribe’s common access paths, the Massachusetts governmental common land grants, and the judicially partitioned deeds changing the ownership to deeds in severalty — there was not expressed or implied intent in the land history by the Gay Head Tribe grantees or grantors with respect to conveying easements by necessity to avoid creating landlocked parcels. Again, the point to be emphasized is that, given the Tribe’s ancient history of custom and practice, one would not likely discern or find intent, express or implied, to convey what already existed, in fact, by common access.
2. The history of the Gay Head Tribe’s common ownership, judicial partition, and the Tribe’s members’ individual rights by ownership in severalty. Although quite arcane, it is important to consider the property form of ownership of the Tribe’s lands before and after the 1870-1878 judicial partition.
First, the subject lands were held in common ownership[5] prior to the judicial partitioning process. After the partitioning process, the lands were held in severalty.[6] The deeds in severalty to the Tribe members/real parties in interest in the partitioning process, in our opinion, resulted in a “carry-through” of the preexisting right of common access of the Tribe members to their lands now held in severalty.
Turning first to the real parties in interest, the historic record demonstrates, and it is important to emphasize, that the real parties *14 in interest to the partitioning process,[7],[8] which led to the crafting of deeds in severalty to the Gay Head Tribe members, were not the commissioners, whose functions were administrative.[9] Indeed, given the administrative drafting mandate to the commissioners to divide and reformulate the Tribe’s common lands to lands in severalty, one would not expect to see, and there are not to be seen, expressions of the commissioners’ intent on easements yea or nay. Intent was beyond the pale of the commissioners.
To be further noted in this land history are the legislative enactments which preceded the judicial partition of the Tribe’s lands. In 1869 and 1870, to address the inequity of Native Americans having limited land ownership rights under State law, the Legislature enacted St. 1869, c. 463, and St. 1870, cc. 213, 293, 350. It is the 1870 statute[10] involving partition and common ownership that is important to consider in this case. As to the subject lands at issue here, the process for division of the Tribe’s common lands was set forth in St. 1870, c. 213, § 6:
“The judge of probate of the county of Dukes-county, upon the application of the selectmen of Gay Head, or of any ten resident owners of land therein ... if he shall adjudge that it *15 is for the interest of said parties that any or all of the common lands of said town be divided, shall appoint two discreet, disinterested persons commissioners to make partition of the same, and their award, being confirmed by said court, shall be final in the premises.”
As previously noted it was the Gay Head Tribe members who proceeded as the real parties in interest and filed petitions for partition of the common lands, which enjoyed common access by custom and practice. One petition in September, 1870, requests the court “to divide and set off our parts in severalty to us of all the common land in” Aquinnah. Another petition, dated October 17, 1870, states, “we shall be greatly benefited if our part of the common land in Gay Head be set off to us in severalty[11]. ... We the undersigned... take this method to request your honor to put us in possession of what belongs to us of the said common land!’ (emphasis added). It is, of course, not surprising that the newly enfranchised Tribe members, in this petition to enforce for the first time their now real and full well justified right to own property, did not in their petition express any intent concerning easements.
*16 To complete the historic background, on December 5, 1870, a judge of the Probate Court decreed as follows:
“It appearing to the Court that it would be for the benefit of the people of said Town of Gay Head that their said Common Lands should be divided as prayed for and as the Statute in that case provides, [i]t is decreed that said Lands be so divided.”
Then, finally, on May 12, 1879, having completed the partition of the lands, the commissioners wrote as follows:
“Not considering it best for the interests of the parties owning the lands [that is, the Tribe members] referred to in the for[e]going Warrant that any part thereof should be sold, in which opinion said parties unanimously concurred, we have set off and divided the same among the people [the Tribe members] entitled thereto” (emphasis added).
To end this aspect of this opinion, as demonstrated above, in these large scale governmental partitioning land transactions, the question of private grantor/grantee intent was not present. Simply put, this is not a case, such as is presented in general private land conveyances, where “the actual intention of the parties as disclosed by the oral testimony makes it plain that there was express understanding that there should be no right of way over other land of the grantor.” Orpin v. Morrison, 230 Mass. 529, 534 (1918). Accordingly, our analysis must account for the Gay Head Tribe’s preexisting access rights, which rights serve to establish that the Tribe’s members understood that there were rights of way and access.
3. The Restatement §2.15 rule of law on easements by necessity. The implication of easements by necessity is in accord with the property law set forth in § 2.15 of the Restatement. The black letter rule of the Restatement § 2.15 provides as follows:
“A conveyance that would otherwise deprive the land conveyed to the grantee ... of rights necessary to reasonable enjoyment of the land implies the creation of a servitude granting . . . such rights, unless the language or circumstances of the conveyance clearly indicate that the parties intended to deprive the property of those rights.”
Comment b to Restatement § 2.15 on easements further supports easements by necessity in this case:
*17 “Access rights are almost always necessary to the enjoyment of property. In a conveyance that would otherwise deprive the owner of access to property, access rights will always be implied, unless the parties clearly indicate they intended a contrary result. The most commonly implied access rights are those to connect property with a public road, but there are others.”
Further, comment e to Restatement § 2.15 emphasizes that “[mjere proof that [the parties] failed to consider access rights, or incorrectly believed other means to be available, is not sufficient to justify exclusion of implied servitudes for rights necessary to its enjoyment.” See Restatement § 2.15 comment a (describing history and rationale of “[p]ublic policy favoring use and occupation of land”).
Here, the Massachusetts governmental land grant and judicial partitioning process involved neither private negotiations nor parties on either side who likely would, or actually did, state or express intent concerning easements vis-a-vis the lands, and the parties certainly did not “clearly indicate that [they] intended to deprive the property of those rights.” Restatement § 2.15.
4. Massachusetts property law on easements by necessity follows Restatement §2.15. Even were we not to adopt per se or follow Restatement § 2.15 as controlling, Massachusetts property law — albeit developed in the context of private land conveyancing — would still presume easements by necessity here.
The implied presumption in favor of easements by necessity over otherwise landlocked property underlying § 2.15 of the Restatement is in accord with the Massachusetts common law of property. Thus, even if we declined to follow the Restatement, easements by necessity should exist here. That the Tribe’s land transfer involved governmental actions and a judicial partitioning process does not alter the presumptions of a legal right of access under Restatement § 2.15 or Massachusetts law.
Under Massachusetts law, in a conveyance with the prospect of leaving property landlocked, there is presumed access by an easement by necessity, absent contrary evidence rebutting the presumption and proving that the conveying parties did not intend access, but rather intended to cut off access and convey land that is landlocked. “The law presumes that one will not sell land to another without an understanding that the grantee shall have a legal right of access to it, if it is in the power of the grantor to give *18 it, and it equally presumes an understanding of the parties that one selling a portion of his land shall have a legal right of access to the remainder over the part sold if he can reach it in no other way. This presumption prevails over the ordinary covenants of a warranty deed.” Davis v. Sikes, 254 Mass. 540, 545-546 (1926), quoting from New York & New England R.R. v. Railroad Commrs., 162 Mass. 81, 83 (1894). “A right of way of necessity over land of the grantor is implied by the law as a part of the grant when the granted premises are otherwise inaccessible, because that is presumed to be the intent of the parties. ... It is founded on the idea that it is the purpose of the parties that the conveyance shall be beneficial to the grantee. ... It is, however, a pure presumption raised by the law.” Orpin v. Morrison, 230 Mass. at 533. “ ‘Easements by necessity’ refer to rights-of-way presumed at common law when a landowner conveys a portion of his land but still needs access over the transferred property to reach the property he retained.” Bedford v. Cerasuolo, 62 Mass. App. Ct. 73, 77 (2004). See generally Eno & Hovey, Real Estate Law § 8.14 (4th ed. 2004).
In conclusion, this record presents a historical background supporting the presumption of easements by necessity in that the original grantees, the members of the Gay Head Tribe, by custom and practice, enjoyed rights of access to cross over the subject lands. Further, the record also tracks the presumption in our State property law that favors easements by necessity to keep “free” lots from being landlocked. Accordingly, we reverse the judgment, and remand for further proceedings consistent with this opinion.

So ordered.

We note that litigation involving these lands was before this court previously in Kitras v. Aquinnah, 64 Mass. App. Ct. 285 (2005) (Kitras I). However, Kitras I did not address whether easements by necessity existed and, if so, what the parameters of such easements would be. Rather — and it is an important rather — the only issue decided in Kitras I was whether the United States was an indispensable party to the case. This court held the United States was not a necessary party. Because the easement by necessity questions were not the issue resolved by this court in Kitras I, we remanded to the Land Court to determine the easement question — the precise question in this appeal.

Lands held in common are held as “tenements by several and distinct titles . . . but occupied] in common, the only unity recognized . . . being that of possession.” Bouvier, Law Dictionary Adapted to the Constitution & Laws of the United States of America, and of the Several States of the American Union 580 (14th ed. 1882). “[Tjwo or more persons may have concurrent interests in the land; the common characteristic of all such interests being that the owners have no separate rights as regards any distinct portion of the land, but each is interested, according to the extent of his share, in every part of the whole land.” Tiffany, Law of Real Property & Other Interests in Land § 161, at 370 (1903). Lands “granted in large parcels, to a great number of grantees ... for the purpose of forming towns . . . have invariably, and from the earliest settlement of the country, been considered as vesting in the grantees and their heirs estates in common.” Higbee v. Rice, 5 Mass. 344, 350 (1809).

An estate held in severalty is defined as “[a]n estate which is held by the tenant in his own right only, without any other being joined or connected with him in point of interest during the continuance of his estate.” Bouvier, supra at 517. “[Ijnterests ... in which the right to possession is in one person at a time ... are called estates in severalty.” Hopkins, Law of Real Property 332 (1896).

Partition is the “dividing of lands held by . . . tenants in common, into distinct portions, so that they may hold them in severalty. . . . Partition is voluntary or judicial. ... It is judicial when it is made by the authority of the court, and according to the formalities prescribed by law.” Black’s Law Dictionary 876-877 (2d ed. 1910).

“In proceedings for partition, the court first determines the share to which each cotenant is entitled, and then the actual partition of the land by metes and bounds is made by commissioners ... and their report, if satisfactory, is ratified by the court, and a final judgment or decree in accordance therewith is entered.” Tiffany, supra at § 175, at 407.

“The actual division of the land in partition is made by commissioners appointed by the court. . .. Probate courts .. . have power to make partition of estates over which they have acquired jurisdiction.” Hopkins, supra at 345-346. In this case, Joseph T. Pease and Richard L. Pease were appointed commissioners in 1870.

Pursuant to St. 1869, c. 463, Native American lands held in severalty became fee simple estates under State law. See Danzell v. Webquish, 108 Mass. 133, 134 (1871) (“By recent legislation, the Indians of the Commonwealth have been fully enfranchised from the subjection in which they had heretofore been kept, and put upon the same footing as other citizens, and provision made for the division of their lands among them in severalty as their absolute property. Sts. 1869, c. 463; 1870, cc. 213, 293, 350”). However, specifically exempted from these provisions of the 1869 statute were “the Indians of Marshpee and Gay Head.” Coombs, petitioner, 127 Mass. 278, 280 (1879), quoting from St. 1869, c. 463.

In construing a similar statute (St. 1870, c. 293, § 6) applying to the common lands of the Mashpee Wampanoag Tribe (Mashpee Tribe), the Supreme Judicial Court held that the common lands were to be held by the town, subject to partition and division of said common lands. Coombs, petitioner, 127 Mass. at 280. As to the Mashpee Tribe’s common lands, the court wrote as follows:
“In pursuance of the policy established by the St. of 1869, the district . . . was incorporated as a town . . . and all common lands and other rights, belonging to the district, were transferred to the new town to be held as property and rights are held by other towns.”
“[I]t was not only a proper but a wise exercise of power for the Legislature to frame provisions by which common lands belonging to the town or the tribe, and the proceeds from the sale of such lands, should be divided. The Legislature could impose any reasonable qualifications or restrictions upon the privileges and powers conferred by the statute, either upon the town or upon the people.... [W]e are of opinion that it was the intention of the statute to provide a tribunal by which partition or sale of common lands could from time to time be directed; and that the power of the tribunal is exhausted only when all the common lands have been divided and sold.” (Emphasis added.)