NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11885

MARIA A. KITRAS, trustee,[1] & others[2] vs.  TOWN OF AQUINNAH &
others.[3]


     Suffolk.     December 8, 2015. - April 19, 2016.

 Present:  Gants, C.J., Spina, Cordy, Duffly, Lenk, & Hines, JJ.


Easement.  Necessity.  Real Property, Easement.  Law of the
     Case.



     Civil action commenced in the Land Court Department on May
20, 1997.

     After review by the Appeals Court, 64 Mass. App. Ct. 285
(2005), the case was heard by Charles W. Trombly, Jr., J.

---

     [1] Of Bear Realty Trust, Bear II Realty Trust, and Gorda
Realty Trust.

     [2] James J. Decoulos, as trustee of Bear II Realty Trust and
Gorda Realty Trust; Mark D. Harding; and Sheila H. Besse and
Charles D. Harding, Jr., as trustees of Eleanor P. Harding
Realty Trust.

     [3] The Commonwealth; Joanne Fruchtman; Jack Fruchtman;
Benjamin L. Hall, Jr., as trustee of Gossamer Wing Realty Trust;
Brian M. Hall, as trustee of Baron Land Trust; Caroline Kennedy;
Edwin Schlossberg; Martha's Vineyard Land Bank; Vineyard
Conservation Society, Inc.; David Wice; and Betsy Wice.

After further review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

Jennifer S.D. Roberts for Vineyard Conservation Society, Inc.

Diane C. Tillotson for Martha's Vineyard Land Bank.

Ronald H. Rappaport for town of Aquinnah.

Wendy H. Sibbison for Maria A. Kitras & another.

Leslie Ann Morse for Mark D. Harding & others.

Jennifer H. Flynn, Assistant Attorney General, for the Commonwealth, was present but did not argue.

The following submitted briefs for amici curiae:

Lawrence H. Mirel, of the District of Columbia, for Aquinnah/Gay Head Community Association.

Andrew H. Cohn, Felicia H. Ellsworth, & Claire M. Specht for Real Estate Bar Association for Massachusetts, Inc., & another.

Nicole Friederichs, Lorie Graham, & Jeffrey Pokorak for Wampanoag Tribe of Gay Head (Aquinnah).

Michael Pill, pro se.

SPINA, J.  In this case, we are asked to determine whether easements by necessity were created as a result of an 1878 partition of Native American common land in the town of Gay Head (now known as Aquinnah).[4]  Gay Head is located on the western coast of Martha's Vineyard, connected to the rest of the island by an isthmus.  At the time of the 1878 partition, Gay Head was inhabited solely by members of the Wampanoag Tribe of Gay Head (Tribe).[5]  When two commissioners appointed by the probate court

---

[4] The town of Gay Head officially changed its name to the town of Aquinnah in 1997.  See St. 1998, c. 110.

[5] The Wampanoag Tribe of Gay Head (Tribe) was federally recognized as a tribe on April 10, 1987.  52 Fed. Reg. 4193 (1987).

pursuant to statute partitioned the common land into hundreds of lots to be held in severalty[6] by members of the Tribe, they did not include express easements providing rights of access, leaving the lots landlocked.  The plaintiffs are owners of several lots created by this partition and are seeking, over one hundred years later, easements by necessity over the lots of the defendants.  We conclude that the defendants presented sufficient evidence to rebut the presumption that the commissioners intended to include rights of access and, therefore, no easements by necessity exist.[7]

1.  Procedural history.  The plaintiffs initiated this action in 1997 by filing a complaint for declaratory judgment. In June, 2001, a Land Court judge allowed the defendants' motions to dismiss, concluding that the United States was an indispensable party because any easement by necessity found would burden the tribal lands held in trust by the United States.  The plaintiffs appealed.  In 2005, the Appeals Court decided that before addressing the issue whether the United

---

[6] "An estate in severalty is one that is held by a person in his own right only, without any other person being joined or connected with him, in point of interest, during his estate therein."  Black's Law Dictionary 1374 (6th ed. 1990), citing 2 W. Blackstone, Commentaries *179.

[7] We acknowledge the amicus briefs submitted by Aquinnah/Gay Head Community Association; The Real Estate Bar Association for Massachusetts, Inc., and The Abstract Club; Michael Pill; and the Wampanoag Tribe of Gay Head.

States was an indispensable party, it first had to decide whether easements by necessity could be implied for all or some of the lots. Kitras v. Aquinnah, 64 Mass. App. Ct. 285, 291 (2005) (Kitras I). The court concluded that lots numbered 189 and above were created by the partition of the common land and, thus, had the requisite unity of title to establish an easement by necessity. Id. at 293-294. Lots 189 and below were deemed held in severalty by members of the Tribe, which foreclosed the possibility of an easement by necessity because there was no unity of title as to those lots.[8] Id. at 292. The Appeals Court concluded that the United States was not an indispensable party because the lands in question were subject to a 1983 settlement agreement which provided that any land owned by the Wampanoag Tribal Council of Gay Head, Inc., a federally recognized Native American tribe, in the town of Aquinnah or in the Commonwealth, would be subject to the civil jurisdiction of the Commonwealth. See id. at 297. See also Building Inspector & Zoning Officer of Aquinnah v. Wampanoag Aquinnah Shellfish Hatchery Corp., 443 Mass. 1, 3, 14 (2004). The Appeals Court reasoned that because the Tribe had waived its sovereign immunity as to these lands in the 1983 settlement agreement, the need to join the United

---

[8] The record includes lot 189 with both land held in severalty and land in common. For clarity and because no issue turns on this fact, we will continue to designate lots 189 and above as the lots created from the common land.

States as a necessary party had been eliminated.  Kitras I, supra at 298.  Ultimately, the Appeals Court reversed and remanded the case to the Land Court to determine whether there was an intent to create easements affecting lots 189 and above and, if so, the scope of such easements.  Id. at 301.

On remand, a Land Court judge bifurcated the trial, addressing first whether rights of access were intended at the time of the partition in 1878, creating easements by necessity. If so, then the judge would decide the location and proper routes of such easements.  The parties each submitted documents and their respective objections.  The judge ruled that the parties' focus on lot 178 was not relevant because the Appeals Court had concluded that only lots 189 and above have the required unity of title for an easement by necessity.  The judge decided the case on documentary evidence submitted by the parties, without testimony.  The judge concluded that easements by necessity did not exist because there was sufficient evidence to rebut the presumed intent of the grantor commissioners to create access easements.  The plaintiffs appealed.

A divided panel of the Appeals Court reversed and remanded the case to the Land Court to determine the location of the easements by necessity.  Kitras v. Aquinnah, 87 Mass. App. Ct. 10, 18 (2015) (Kitras II).  We granted the defendants'

applications for further appellate review.[9]  The plaintiffs argue
(1) that there was a presumed intent that the grantees had legal
access to their lots and the defendants did not present
sufficient evidence to rebut the presumption; and (2) that lot
178, like the plaintiffs' other lots, is entitled to an easement
by necessity.  The defendants argue that the trial judge (1)
properly decided that no easements by necessity were created as
a result of the 1878 partition; and (2) properly declined to
reconsider whether lot 178 was included in the partition of the
common lands.  We affirm the judgment of the trial court.

2.  Facts.  This case presents a unique set of facts in
which we must examine a large-scale partition of Native American
common land that occurred over one hundred years ago and
ascertain the intent of the parties.  The majority of the facts
arise from several reports written by commissioners appointed by
the probate court pursuant to statute who were ordered to visit
and describe the condition and circumstances of the various
Native American tribes located in Massachusetts.  For much of
the Nineteenth Century, a guardianship system managed the Native

---

[9] The Vineyard Conservation Society, Inc.; Martha's Vineyard
Land Bank and the town of Aquinnah; and the Commonwealth
submitted applications for further appellate review.

American tribes.[10]  St. 1828, c. 114, § 2.  Under this system,
Native Americans were designated "involuntary wards of the
State" where they could not sue or be sued, enter into legally
binding contracts, or sell land to people outside of their own
tribe.  Report to the Governor and Council, 1862 House Doc. No.
215, at 39.  See Report of the Commissioners, 1849 House Doc.
No. 46, at 20; 2 C.E. Banks, The History of Martha's Vineyard 14
(1966) (Banks); St. 1828, c. 114.  In the mid-Nineteenth
Century, the Legislature began to depart from a paternalistic
system of governance and move toward granting Native Americans
full citizenship.  Report to the Governor and Council, 1862
House Doc. No. 215, at 7.  Over the years, the Legislature
appointed commissioners and committees to visit the Native
American tribes and assess the tribes' condition, their way of
life, and whether citizenship would be in their best interest.
Id. at 6-7.

---

[10] The Tribe at Gay Head was different.  The Tribe grew
dissatisfied with their guardians in the early Nineteenth
Century, and the guardians subsequently resigned.  Report of the
Commissioners, 1849 House Doc. No. 46, at 20.  The Tribe had an
opportunity to accept an act of the Legislature in 1828 and have
a new guardian appointed.  However, the Tribe never accepted the
act.  See id.; St. 1828, c. 114.  Therefore, for a majority of
the Nineteenth Century, the members of the Tribe "[were] without
any guardian, and the division of their lands, and indeed the
whole arrangements of their affairs, except of the school money,
[were] left to themselves."  Report of the Commissioners, supra.
Despite this, the Tribe members were still considered
"involuntary wards of the State."  Report of the Commissioners,
1862 House Doc. No. 215, at 39.

In 1862, the Legislature established the district of Gay Head.  St. 1862, c. 184, §§ 4, 5.  Before the severance at issue in this case, Gay Head consisted of about 2,400 acres, of which about 450 acres were held in severalty and the remainder was held by the Tribe in common.  Report of the Committee of the Legislature of 1869 on the Condition of the Gay Head Indians, 1870 Senate Doc. No. 14, at 4 (Report of the Committee).  At that time the prevailing custom of the Tribe admitted "that any native could, at any time, appropriate to his own use such portion of the unimproved common land, as he wished, and, as soon as he enclosed it, with a fence, of however frail structure, it belonged to him and his heirs forever."  Report of the Commissioners, 1849 House Doc. No. 46, at 20.  See R.L. Pease, Report of the Commissioner Appointed to Complete the Examination and Determination of All Questions of Title to Land and of All Boundary Lines Between the Individual Owners, at Gay Head, on the Island of Martha's Vineyard, at 22 (May 22, 1871) (Pease Report).  The Tribe had another custom that allowed each member access, as necessary, across the common land and lands held in severalty.[11]  The Legislature appointed Charles Marston

---

[11] In the plaintiffs' reply brief, they argue for the first time that there was no evidence of such tribal custom.  We decline to address this argument.  Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).  See Canton v. Commissioner of the Mass. Highway Dep't, 455 Mass. 783, 795 n.18 (2010).

to determine the boundary lines of the land held in severalty by Tribe members and the boundary line "between the common lands . . . and the individual owners adjoining said common lands," and report the details and results of his efforts. St. 1863, c. 42. Due to "advancing age and sickness," Marston was unable to complete the task assigned, but he was able to prepare deeds and determine the boundary lines for a number of lots. Report of the Commissioner, 1866 House Doc. No. 219, at 3. The Legislature appointed Richard Pease to complete Marston's charge. See St. 1866, c. 67; Pease Report, supra at 3.

As the boundary lines were being determined in Gay Head, the Legislature granted Native Americans full citizenship. An Act to Enfranchise the Indians of the Commonwealth, St. 1869, c. 463. While other tribes were able to take full advantage of their citizenship status, the Tribe at Gay Head remained an aberration. Because Gay Head had not been incorporated as a town, the Tribe could not freely enjoy the newly acquired benefits of citizenship such as voting at town meetings or electing town officers. Pease Report, supra at 27-28; Report of the Committee, 1870 Senate Doc. No. 14, at 4; Banks, supra at 17-18. Governor Claflin underlined this "political anomaly" during his annual address in 1869. Report of the Committee, 1870 Senate Doc. No. 14, at 2-4. See Pease Report, supra at 27; Banks, supra at 17-18. With the hope of resolving the

situation, a committee of Massachusetts Senators and Representatives visited Gay Head to determine whether it should be incorporated as a town. Report of the Committee, supra. The committee concluded that the members of the Tribe were capable of self-governance, well qualified, and supportive of the prospect of becoming a town. Id. at 11. As a result, the committee unanimously recommended that the district of Gay Head be incorporated as a town. Id. The Legislature responded quickly and officially incorporated the town of Gay Head. St. 1870, c. 213. The Legislature simultaneously established a process by which the members of the Tribe could choose to partition the common land. St. 1870, c. 213, § 6. "[A]ny ten resident owners of land" or, in the alternative, the selectmen of Gay Head may petition the probate court to initiate a division of the common land. Id. After notice and a hearing, if a probate judge determined that it was in the best interest of the parties for the common land to be divided, the judge would appoint commissioners to partition the land. Id.

In September, 1870, seventeen Gay Head residents petitioned a probate judge in Dukes County to divide the common land for the residents to hold in severalty.[12] Petition, Citation, and

---

[12] The selectmen and a group of other residents of Gay Head filed a petition in opposition, characterizing the partition as "premature and unsafe," adding that it would "be attended with

Decree for Division and Setting Off Our Lands in Gay Head, Sept. 1, 1870. Court records reveal that after a hearing at which no one objected, Theodore Mayhew, a probate judge in Dukes County, concluded that the partition would be beneficial for the residents of Gay Head. Joseph L. and Richard L. Pease were appointed commissioners. In addition to partition, Richard Pease also was assigned to determine the boundary lines between the common land and the land held in severalty. St. 1866, c. 67. The commissioners completed the partition in 1878. The land was divided into more than 500 lots. Not one lot included an express easement of access. As a result, the majority of the lots divided from the common land were landlocked. The commissioners expressly included a right of access over three lots to a creek for the purpose of fishing. They also reserved to certain lots the right to remove peat from other lots.

At the time of the division, there was an existing road that provided access from the Gay Head lighthouse to Chilmark, the neighboring town to the east. Report of the Committee, 1870 Senate Doc. No. 14, at 9. The road was in such "deplorable condition" that the committee in 1870 insisted that the

disastrous consequences" to the inhabitants. Petition of persons in Gay Head for Division of Common Lands, Sept. 7, 1870. Subsequently, another petition was filed by various residents in support of the division of the common land. Petition in and of the Petition of Citizens of Gay Head for Division of Common Lands, Oct. 17, 1870.

Legislature repair the road. Id. However, the lots at issue in this case did not abut this road. Over the past one hundred years, the landscape of Gay Head has changed. There are other roads in existence, such as the Moshup Trail that was created decades after the partition of the common land. The plaintiffs' lots do not abut these roads and remain landlocked.

3. Standard of review. Generally, in a jury-waived case we review the trial judge's findings of fact for clear error. See U.S. Bank Nat'l Ass'n v. Schumacher, 467 Mass. 421, 427 (2014); Board of Registration in Med. v. Doe, 457 Mass. 738, 742 (2010). However, "[w]here findings are predicated not on the assessment of witness credibility but, rather, on documentary materials, this highly deferential standard is inapplicable." Commonwealth v. Pugh, 462 Mass. 482, 494-495 (2012). In this case, we are in the same position as the trial judge to view the evidence and therefore no special deference is shown. However, this case was not decided on documentary evidence alone. It was presumed and undisputed that there was a tribal custom that allowed the Tribe members to pass freely over each other's land as necessary. This presumed fact is the law of the case and with respect to this one issue. We will continue to treat it as fact. We review the judge's conclusions of law de novo. U.S. Bank Nat'l Ass'n, 467 Mass. at 427.

4. <u>Easement by necessity</u>. An easement is a limited, nonpossessory interest in the land of another that can be created expressly, see <u>Cheever</u> v. <u>Graves</u>, 32 Mass. App. Ct. 601, 605-606 (1992), by prescription, see G. L. c. 187, § 2 (easement by prescription), or by implication, see <u>Kitras I</u>, 64 Mass. App. Ct. at 291. An easement by necessity is a type of implied easement. "An implied easement is 'founded on the idea that it is the purpose of the parties that the conveyance shall be beneficial to the grantee,'" even if it had not been expressed in the instrument of conveyance. <u>Ward</u> v. <u>McGlory</u>, 358 Mass. 322, 325 (1970), quoting <u>Orpin</u> v. <u>Morrison</u>, 230 Mass. 529, 533 (1918). An easement by necessity most often arises when a conveyance renders a parcel of land landlocked. It provides access over the parcel that is not landlocked, if the parties so intended. There is no public policy that creates an easement by necessity to make land accessible. <u>Kitras I</u>, <u>supra</u> at 298. <u>Richards</u> v. <u>Attleborough Branch R.R. Co</u>., 153 Mass. 120, 122 (1891). It is a purchaser's "own folly" that he purchased land that had no access to some or all of the land "and he should not burden another with a way over his land, for his convenience." <u>Orpin</u>, <u>supra</u> at 533-534. <u>Gayetty</u> v. <u>Bethune</u>, 14 Mass. 49, 56 (1817). "The law does not give a right of way over the land of other persons to every owner of land who otherwise would have no means of access to it." <u>Richards</u>, <u>supra</u>.

The party claiming an easement by necessity has the burden of establishing that the parties intended to create an easement that is not expressed in the deed. Mt. Holyoke Realty Corp. v. Holyoke Realty Corp., 284 Mass. 100, 105 (1933). The law has devised a presumption to assist the inquiry into the intent of the parties when a conveyance renders a parcel of land landlocked. It is the presumed intent of the parties that when a parcel of land becomes landlocked as a result of a conveyance the land conveyed included rights of access. Orpin, 230 Mass. at 533. See Davis v. Sikes, 254 Mass. 540, 545 (1926); Schmidt v. Quinn, 136 Mass. 575, 576 (1884) ("for when land is conveyed which is inaccessible without trespass, except by passing over the land of the grantor, a right of way by necessity is presumed to be granted; otherwise, the grant would be practically useless"); Bedford v. Cerasuolo, 62 Mass. App. Ct. 73, 76-77 (2004). It is a "pure presumption raised by the law" that an easement by necessity exists, and this presumption is construed with strictness. Orpin, supra. A presumption of easement by necessity arises upon a showing of the following elements: (1) unity of title; (2) severance of that unity by a conveyance; and (3) necessity arising from the severance, most often when a lot becomes landlocked. Kitras I, 64 Mass. App. Ct. at 291. The necessity must have existed at the time of the division. See Viall v. Carpenter, 14 Gray 126, 127 (1859).

The parties opposing the easement may rebut the presumption by presenting evidence that at the time of conveyance the parties did not intend to create rights of access.  Orpin, 230 Mass. at 531, 534 (presenting oral testimony of conversation between original parties to rebut presumption).[13,14]  The intent of the parties can be ascertained from the circumstances surrounding the conveyance, the information known to the parties of the conveyance, the language of the instrument, and the physical condition of the land.  Dale v. Bedal, 305 Mass. 102, 103 (1940); Davis, 254 Mass. at 545; Orpin, supra at 533.

---

[13] Section 301(d) of the Massachusetts Guide to Evidence (2015) is applicable.  That section states:  "A presumption imposes on the party against whom it is directed the burden of production to rebut or meet that presumption. . . .  If that party fails to come forward with evidence to rebut or meet that presumption, the fact is to be taken by the fact finder as established.  If that party comes forward with evidence to rebut or meet the presumption, the presumption shall have no further force or effect.  A presumption does not shift the burden of persuasion, which remains throughout the trial on the party on whom it was originally cast."

[14] The defendants rely somewhat on the Restatement (Third) of Property (Servitudes) § 2.15 (2000) (Restatement) to describe the applicable law governing easements by necessity in Massachusetts.  The Appeals Court determined that the Restatement was applicable.  See Kitras v. Aquinnah, 87 Mass. App. Ct. 10, 16-17 (2015) (Kitras II).  We decline to decide whether we should adopt the Restatement, as our result would be the same under our common law as well as the Restatement.  The Restatement includes a broader range of issues than this case presents, and we reserve for another day the question whether to adopt that section of the Restatement.

5. Discussion. The Land Court judge assumed that the plaintiffs satisfied the elements of a presumption of an intent to establish an easement by necessity but concluded that the defendants submitted sufficient evidence to rebut the presumed intent of the parties. The judge concluded that (1) tribal custom and usage of the land, (2) other rights granted, and (3) the condition of the land at the time of partition provided sufficient evidence to rebut the presumed intent. We agree.

We first must determine whether the requisite elements exist that give rise to a presumption of an intent to create an easement by necessity. There is no dispute amongst the parties that, as to the first two elements, there was unity of title (aside from lot 178) and a subsequent severance of that unity of title.[15] The defendants contend that the plaintiffs have not satisfied the third element of necessity arising from the severance. There is no question that the lots at issue are landlocked. However, we must look to the circumstances at the time of the conveyance to determine whether necessity existed. Mt. Holyoke Realty Corp., 284 Mass. at 104. Richards, 153 Mass. at 122. Schmidt, 136 Mass. at 576-577. At the time of the

_____

[15] Vineyard Conservation Society, Inc. (VCS), argues that the plaintiffs' contention that title to the common land was owned by the town of Gay Head with the Commonwealth retaining the power to convey is contrary to the historical record. However, VCS acknowledges that "nothing turns on the dispute."

partition in question, the prevailing tribal custom was to allow members of the Tribe to pass freely over the common land and land held in severalty when necessary.  In other words, the lots already had access rights, rendering express rights of access unnecessary.  Despite this question of necessity, where the lots in question appear to be landlocked because of the partition, we proceed under the assumption that the plaintiffs have established the three elements that give rise to the presumption of an intent to create an easement by necessity.  The defendants' contention is more appropriately analyzed as rebuttal.

The primary question in this case is whether, at the time of partition, the parties intended to provide rights of access to the hundreds of lots divided from the common land. Admittedly, this case does not present circumstances that typically support the presumption of an easement by necessity. The typical situation involves one grantor and one grantee, and it is their intent that is dispositive.  In this case, we have a large scale partition of Native American common lands that have multiple grantees, and the commissioners who were appointed by the probate court (as authorized by the Legislature) as the grantors.  We look to the intent of these parties to determine

whether they intended to create rights of access in the hundreds of lots partitioned.[16]

After analyzing the circumstances surrounding the 1878 partition and the information known to the commissioners at the time of the partition, we conclude that at that time the parties did not intend to create easements, and that therefore the defendants presented sufficient evidence to rebut the presumption. There was evidence that tribal custom provided access rights to members of the Tribe, other easements were created, and the land was in poor condition at the time of partition. This evidence is sufficient to rebut the presumption that the grantor intended to include easements by necessity.

The plaintiffs argue that the historical context of the partition makes it clear the intention was to provide rights of access to the lots. According to the plaintiffs, one of the goals of granting Native Americans citizenship was to allow them to own and sell property and that is why the Legislature authorized the partition of the common land. The plaintiffs

---

[16] It is not clear whether the plaintiffs are relying on the intention of the Legislature or the commissioners, or both, as they identified the grantor as the "General Court" who authorized the commissioners and the probate court to act on its behalf. We interpret St. 1870, c. 213, § 6, as the Legislature empowering the probate court to appoint commissioners to partition the land and leaving the details of the division to the appointed commissioners. It is the commissioners' intent that we view as dispositive.

maintain that if easements of access were not intended, the Tribe members' lots would not be salable and this would undermine the Legislature's purpose of granting Native Americans citizenship.  The plaintiffs are correct in saying that the Legislature considered the ability to exercise control over one's own property as a privilege of citizenship.  See Report of the Committee, 1870 Senate Doc. No. 14, at 5.  However, we do not glean from the record the Legislature's intention to create access rights for the purpose of dividing the common lands into salable property.  See St. 1870, c. 213, § 6.  The historical record demonstrates that it was for the members of the Tribe to determine whether to partition their common land because "[t]his . . . is a question of 'property,' which every 'citizen' should have the privilege of determining for himself."  Report of the Committee, supra.  The Legislature merely gave the Tribe the authority to choose to partition their common land and a method by which to do so.  Furthermore, it was the commissioners who carried out the division of the common lands with input from the Tribe.

At the time of the partition, the tribal custom admitted free access over all the land, as necessary.  It is likely that the commissioners did not think that rights of access were necessary because it was provided by tribal custom.  The

plaintiffs argue that the Legislature knew that Indian title[17] was nonexistent at the time of partition and that, even if it did not, the Legislature did not intend for tribal customs to prevail after partition. This argument fails. "[W]e see no reason why the common practice, understanding and expectations of those persons receiving title could not shed light on the parties' probable, objectively considered intent." Kitras I, 64 Mass. App. Ct. at 300. The commissioners partitioned the common land after a lengthy process that took into consideration the wants of members of the Tribe. We find evidence of this process in the reservation of the right to remove peat, and in the decision to leave the cranberry bogs and cliffs in common ownership. We infer that the commissioners, upon learning of this tribal custom, determined that it was not necessary to include access rights for the partitioned lots. Also, whether the tribal custom continued after the partition is not relevant. We look to the condition and circumstances at the time of the partition and not subsequent events.[18] Mt. Holyoke Realty Corp., 284 Mass. at 104. Richards, 153 Mass. at 122.

---

[17] Indian title "gave Indians a 'right of occupancy.'" James v. Watt, 716 F.2d 71, 74 (1st Cir. 1983), cert. denied, 467 U.S. 1209 (1984).

[18] In 1987, aboriginal title was extinguished retroactive to the date of transfer by a member of the Tribe. 25 U.S.C. § 1771b(b) (2012). Title 25 U.S.C. § 1771 (2012) was passed in

The Land Court judge also found persuasive the existence of reserved rights in a number of the deeds, and applied the rule of construction "expressio unius est exclusio alterius" (i.e., to express or include one thing implies the exclusion of the other) when concluding that the omission of other rights of access was intentional. Joyce v. Devaney, 322 Mass. 544, 549 (1948). A number of deeds reserved rights to gather peat from another's land. There were also three instances where rights were reserved for access to a creek for purposes of fishing. The right to gather peat included in a number of deeds is known as a profit à prendre,[19] which the plaintiffs correctly observe is different from an easement. Although a profit à prendre does not specifically grant a right of access, some access is implied in order to go onto specific land to remove that which is

response to the 1983 settlement when the Tribe agreed to extinguish all aboriginal claims. See Building Inspector & Zoning Officer of Aquinnah v. Wampanoag Aquinnah Shellfish Hatchery Corp., 443 Mass. 1, 3-7 (2004). Subsequent events that render a lot landlocked do not give rise to an easement by necessity. See New England Continental Media, Inc. v. Milton, 32 Mass. App. Ct. 374, 378 (1992); Swartz v. Sinnot, 6 Mass. App. Ct. 838, 838 (1978). The necessity must have existed at the time of the division. Viall v. Carpenter, 14 Gray 126, 127 (1859).

[19] A profit à prendre "is a right in one person to take from the land of another either a part of the soil, such as minerals of all kinds from mines, stones from quarries, sand and gravel; or part of its produce, such as grass, crops of any kind, trees or timber, fish from lakes or streams, game from the woods, seaweed, and the like . . . " (citation omitted). Gray v. Handy, 349 Mass. 438, 441 (1965).

described therein. See Gray v. Handy, 349 Mass. 438, 440 (1965). More to the point, a profit à prendre indicates that the commissioners knew how to reserve rights when drafting deeds. The commissioners also clearly provided for a right of access to a creek "for the purpose of fishing and clearing the creek." The fact that the commissioners had the knowledge and foresight to reserve peat rights and expressly grant access to a creek for certain Tribe members is evidence that the omission of access rights to the rest of the land was intentional.

Additionally, the Chappaquiddick Tribe, located on a small island on the eastern coast of Martha's Vineyard, had their common lands divided. The commissioners who partitioned Chappaquiddick's common land included in their deeds express rights of access to roads. It is likely that the commissioners of the Gay Head partition were well aware of the division of the common land at Chappaquiddick because Richard Pease, in his report written in 1871, frequently quoted and cited prior commissioners' reports that described the Chappaquiddick Tribe (as well as other tribes residing in Massachusetts).[20] See Pease Report, supra at 22. See also Report of the Commissioners, 1849 House doc. No. 46, at 8, 11; Report of the Commissioner, 1862

---

[20] One of the commissioners who divided the common land at Chappaquiddick was Jeremiah Pease. The relation, if any, between Jeremiah and the brothers Richard and Joseph Pease is unknown.

House Doc. No. 215, at 16. The fact that an earlier partition of common land on Martha's Vineyard provided rights of access to Tribe members, known to the Gay Head commissioners, supports a finding that the absence of access easements in the conveyance flowing from the Gay Head partitions was intentional, thereby rebutting the presumption of easements by necessity.

The physical condition of the land in question also is a factor when determining the intent of the parties in this case. Dale, 305 Mass. at 103. The multiple reports authored by various commissioners provide detailed descriptions of the quality of the land and the landscape at Gay Head at the time of the partition in 1878. The plaintiffs rely on the many descriptions that praise the land of Gay Head, and assert that the Land Court unnecessarily focused on the few poor descriptions. The plaintiffs are correct in saying that there are some descriptions that praise the land at Gay Head. A group of commissioners described the land as containing "almost every variety of soil; a portion of the land is of the very best quality, and capable, under good culture, of producing most abundant harvests." Report of the Commissioners, 1849 House Doc. No. 46, at 19. John Milton Earle, an appointed commissioner in 1862, described the land as "a great variety of soil, some of it of excellent quality." Report to the Governor and Council, 1862 House Doc. No. 215, at 33. Commissioners

further observed that the land could be "reasonably productive" if there were more money available to tend to the land.  Report of the Committee, 1870 Senate Doc. No. 14, at 5.

Despite the intermittent praise, there were many contrary descriptions of the land as desolate and deficient.  One report described Gay Head as a "Sahara-like desolation" and implored the Legislature to provide a remedy to the poor condition of the Gay Head land, predicting that "unless some remedy is found, the whole will eventually become one cheerless desert waste."[21] Report of the Commissioners, 1856 House Doc. No. 48, at 9.  The special joint committee of Massachusetts senators and representatives who visited Gay Head in 1869, and whose assessment of the land the trial judge credited, thought it better for the common land to be held in common for the whole Tribe "as pasturage and berry lands," than for the land to be divided into lots that ultimately would "lie untilled and comparatively unused."  Report of the Committee, 1870 Senate Doc. No. 14, at 5.  The land also was described as "uneven, rough and not remarkably fertile."  Id.  As the descriptions

---

[21] The commissioners explained that the "sands of the beach, no longer covered, as formerly, with an abundant growth of beach-grass, become the sport of the breeze, and are every year extending inland, covering acre after acre of meadow and tillage land; many acres of which have, within the memory of our informants, been thus swallowed up, and now lie wholly waste and useless."  Report of the Commissioners, 1856 House Doc. No. 48, at 9.

recited above indicate, contrary to the plaintiffs' assertions, the poor condition of the land was predominant and widely documented. It is likely that the commissioners, observing the poor condition of the land, reckoned that rights of access were not needed for land that would "lie untilled and comparatively unused."[22]

We agree with the Land Court judge's conclusions that (1) tribal customs, (2) the existence of other easements included in the deeds, and (3) the condition of the land provide more than sufficient evidence to rebut the presumption that the commissioners intended to create access rights when they partitioned the common land, and that the "[p]laintiffs have failed to introduce evidence sufficient to carry their substantial burden of proving easements by necessity." See Kitras II, 87 Mass. App. Ct. at 30-31 (Agnes, J., dissenting). We conclude that the plaintiffs failed to meet their burden of establishing that the commissioners intended to create easements by necessity.

---

[22] Although not contemporary with the partition at issue, a depiction of Gay Head in an 1887 photograph has been described as "little changed" from an 1844 description as "a level, desolate moor, treeless, shrubless, and barren of all vegetation, save coarse grass and weeds, and a profusion of stunted dog-roses" (citation omitted). P.W. Dunwiddle, Martha's Vineyard Landscapes: The Nature of Change (1994). Based on this information, we infer that the unfavorable condition of the land at Gay Head continued after the division of the common land.

6. <u>Lot 178</u>. The plaintiffs argue that the trial court erroneously excluded lot 178, owned by the plaintiff Maria Kitras (as trustee of Bear Realty Trust), from the remand proceedings. We disagree. In <u>Kitras I</u>, 64 Mass. App. Ct. at 293-294, the Appeals Court concluded that only lots 189 and above could possibly have an easement by necessity. The "law of the case" doctrine applies. "The 'law of the case' doctrine reflects this court's reluctance 'to reconsider questions decided upon an earlier appeal in the same case'" (citation omitted). <u>King</u> v. <u>Driscoll</u>, 424 Mass. 1, 7-8 (1996). An already decided issue should not be reopened "unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." <u>Id</u>. at 8, quoting <u>United States</u> v. <u>Rivera-Martinez</u>, 931 F.2d 148, 151 (1st Cir.), cert. denied, 502 U.S. 862 (1991). In this case, the issue only could have been reopened if the Appeals Court decision in <u>Kitras I</u>, <u>supra</u>, clearly was erroneous and would work a manifest injustice. We see no reason to reopen the issue regarding lot 178.

7. <u>Conclusion</u>. For the foregoing reasons, we affirm the judgment of the Land Court.

<u>Judgment affirmed</u>.